Ada Sandra KOPF, Personal Representative of the Estate of Anthony John Casella, Plaintiff–Appellant,

v.

Joseph P. WING, Corporal; Steven Kerpelman, Corporal; James Skyrm; Prince George's County, Maryland, a body corporate and politic, Defendants–Appellees,

and

Other Unknown Officers of the Prince George's County Police Department, Defendants.

No. 90–2462.

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1991.

Decided Aug. 9, 1991.

Terrell Non Roberts, III, Roberts & Wood, Riverdale, Md., for plaintiff-appellant.

Sean D. Wallace, Michael O. Connaughton, argued (Michael P. Whalen, Alan E. D'Appolito, S. Daniel Wallace, on brief), Upper Marlboro, Md., for defendants-appellees.

Before ERVIN, Chief Judge, HALL, Circuit Judge, and KELLAM, Senior District Judge for the Eastern District of Virginia, sitting by designation.

OPINION

K.K. HALL, Circuit Judge:

Ada Kopf, personal representative of the estate of Anthony Casella, appeals the district court's grant of summary judgment to defendants, police officers and county, in Casella's § 1983 action alleging excessive use of force in making an arrest. Because we find that the appellant made a sufficient showing to survive summary judgment, we reverse and remand.

## I.

Reciting the facts of this case is no easy task. The parties' competing renditions hardly coincide. In the following narrative, we attempt to identify disputed or unilateral assertions of fact as such.

At midnight on February 21, 1988, police received a report of the armed robbery of a carry-out pizza shop in Hyattsville, Maryland, by a white male with a handgun. One hundred dollars had been stolen. Witnesses had recorded the license number of the van in which the perpetrator had fled, and a bulletin was promptly broadcast to all local police.

Within minutes, two Hyattsville city officers spotted the van and gave chase. The van stopped, and the three occupants—Joseph Corcoran, age 29; Tammy Obloy, age 17 and four months pregnant; and Anthony Casella, age 19—fled on foot. Corcoran fell, injured his leg, and was quickly apprehended. Corcoran had thrown the gun out of the window of the van; however, when a search of Corcoran and the van failed to uncover the gun, officers concluded that the remaining suspects might have it. Casella and Obloy hid behind a shed in the back yard of a house in the residential neighborhood. This hiding place was an extremely narrow passage between the shed's wall and a fence. Photographs of it were before the district court.

More officers, county and city, arrived. Among them was appellee Joe Wing with his Prince George's County canine unit dog, "Iron." He made one unsuccessful track around the neighborhood with Iron, but, on a second try, Iron located Casella and Obloy behind the shed.

Wing testified on deposition that, in an "extremely" loud voice, he warned the suspects that they should come out or he would release the dog. Obloy testified that she heard no such warning. No civilian witness heard it, though they heard other aspects of the incident. Wing's loud warning was, however, heard by other police officers.

Wing released Iron. Iron ran to the rear of the shed and entered the passage from the west side. Wing followed; when he reached the corner of the shed, he shined his flashlight and saw Iron encounter Casella and Obloy. Obloy was closer, and Iron bit her first. Casella kicked the dog to try to make it stop biting. According to Obloy, Casella yelled to the officers that Obloy was pregnant and to get the dog off of her. Wing tried to get into the passage, but he could not because of a post that blocked the way. Wing stated that he repeatedly told the two to raise their hands, but they did not. Iron released Obloy's leg and began biting Casella.

At this point, appellees Steven Kerpelman and James Skyrm, also county policemen, entered the defile from the east side, which was blocked by a woodpile but was not so inaccessible as the west entry. Kerpelman and Skyrm grabbed Casella, and the dog continued to bite. Wing did not order Iron to release; instead, noting that Casella had no weapon in his hands, Wing ran back around the shed to assist Kerpelman and Skyrm.

Casella struggled with the dog, Kerpelman, and Skyrm. By this time, Iron was biting Casella in the thigh and groin; still Wing allowed the biting to go on. Casella was kicking the dog and flailing his arms at the officers. He struck Wing, who responded with a blackjack blow to Casella's head, or, as Wing put it at deposition, the "upper head body area." Wing stated that he picked Obloy up and lifted her across the other people and the woodpile to an officer outside the defile in the yard. Wing acknowledged that Iron was still biting Casella in the "upper thigh, groin area," but he only ordered Iron to release after Obloy was removed. Both Kerpelman and Skyrm stated that Skyrm, not Wing, had thrown Obloy over the woodpile.

Kerpelman and Skyrm were meanwhile struggling with Casella, who was in a hunched-over position between standing and kneeling. Kerpelman saw Casella "lunge" toward Skyrm, barely missing Skyrm's gun, and Kerpelman assumed that Casella was trying to get the gun. Skyrm responded by striking Casella with his blackjack, intending, he stated, to strike in

the clavicle. Though Casella was flailing his arms and sometimes striking the officers, Kerpelman and Skyrm managed to grab his shoulder and tried to pull him from the defile. Casella's jacket came off instead, and money fell out of it. On their second try, Skyrm and Kerpelman were able to pull Casella out. During the struggle, Kerpelman struck Casella in the "upper body" with his flashlight "once, maybe twice" with enough force to break the flashlight. He did not remember if he delivered these blows before or after the officers had pulled Casella into the yard. His flashlight broken, Kerpelman then struck Casella "once or twice" in "the upper torso" with his blackjack. He admitted that these blows were inflicted after Casella had been removed from the defile.

Casella was subdued in the yard by all three officers. Contrary to Kerpelman, Skyrm stated that no one struck Casella after he was removed from behind the shed.

Obloy testified that Casella did not resist arrest. Rather, he tried to get Iron off of her, and a policeman said "don't touch my dog" in a "real angry voice," and then struck Casella in the head with a "nightstick thing."

Daniel Stroup, whose backyard abutted the fence behind the shed, was one hundred feet away during the incident. He did not hear any announcement that Wing was going to release the dog, though he saw it released and then heard Obloy scream. Stroup looked at the scene the next day; he saw blood out in the yard, but not behind the shed. Robert Reymer was standing on a corner across the street. He heard no announcement, but he also heard Obloy's scream. In addition, he testified that he could hear a "constant poom, poom, poom, like being punched or hit," which lasted "approximately one minute."

Casella was taken by ambulance to a local hospital. He was frightfully mauled. He was rambling senselessly, which the police attributed to use of drugs rather than Casella's head injuries. A drug test was negative. He had four scalp lacera-

tions, a fractured skull, and a subdural hematoma.

Iron had left his marks, too. Casella had lacerations of the upper lip, chest, knee, leg, and scrotum. He was listed in critical condition, and underwent cranial surgery that night. Photographs of some of Casella's injuries, after treatment, were also before the district court.

Fully two weeks later, on March 4, 1988, Casella was still confused and incoherent, suffering from "traumatic aphasia."[1] He was not released from the hospital until March 28, 1988. He later pled guilty to armed robbery and was sentenced to seven years in state prison.

On February 21, 1989, Casella filed this suit in district court against Wing, Kerpelman, Skyrm, and Prince George's County. His federal claims rested upon 42 U.S.C. § 1983, and he asserted pendent state law claims for battery, negligence, and negligent hiring and training. On July 31, 1989, before his testimony could be recorded, Casella was killed in a prison fight. His mother, Ada Kopf, as his personal representative, was substituted as plaintiff.

On March 21, 1990, the officers and county moved for summary judgment. The appellant opposed the motion. After a hearing, the district court granted the motion on August 7, 1990. Kopf appeals.

## II.

"Objective reasonableness" is the test to determine whether a particular use of force to effect an arrest is excessive. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

> The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often required to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

---

1. Aphasia is a loss or impairment of the ability to use words.

amount of force that is necessary in a particular situation.

*Id.* at 396–397, 109 S.Ct. at 1872.

This substantive law must, in this case, be applied in the context of a motion for summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Did appellant come forward with enough proof in support of the claim that a fair-minded jury could find that the degree of force used against Casella was not "objectively reasonable?" We think that she did.

First of all, the district court resolved some disputes of material fact on summary judgment, where it should have assumed appellant's version as true. For example, the court's opinion states that "Defendant Wing ... announced in a loud voice the presence of the K–9 dog and called on the suspects to surrender." Neither Obloy nor any civilian witness heard the announcement; only police officers testified that it was given. Appellant argues that this factual dispute is crucial, because a forewarning that the dog is going to attack, which provides the suspects a fair chance to surrender, is more reasonable than a surprise assault.

Moreover, appellant provided affidavits from well-credentialed experts on the use of canine units, both of whom were of the opinion that use of the dog when the suspects were surrounded was unreasonable, announcements notwithstanding. Thomas Knott, a retired canine unit trainer for the Baltimore city police, stated that release of a dog without allowing time for the suspects to give up, especially where the suspects were cornered and escape impossible, was unreasonable. The primary purpose of a police dog, according to Knott, is to locate suspects, not to bite them. Knott's opinion was corroborated by the affidavit of Robert diGrazia, former Montgomery County, Maryland, Chief of Police, and former Police Commissioner of Boston and St. Louis. DiGrazia stated that the release of Iron was "contrary to any legitimate purpose for the use of the dog." Appellees

respond that because they feared that the suspects were armed, it was reasonable to subject Iron to the danger of getting shot before committing an officer.

The district court also found that Casella refused to surrender, though called upon to do so; again, whether the announcement was actually made is a material dispute. The court faulted Casella for fighting with the dog rather than surrendering. We believe that a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites his scrotum.

The district court also assumed that Casella fought with the officers and that all of the head blows were inflicted while Casella struggled. Obloy disputed this, and Kerpelman's deposition testimony admits that Casella's flailing about may have been simply his fighting with the dog. Kerpelman received a single cut on the forehead (which was mended with a Bandaid). Neither Wing nor Skyrm was injured. Appellant would from this lack of harm infer that Casella's "fighting" with the officers was exaggerated; we believe that a reasonable jury could make the same inference.

The district court also took into account that the officers reasonably believed that Casella had the gun that had been used in the robbery. Though this belief, which we think was reasonable, might have some bearing on sending in Iron before exposing an officer, the officers quickly saw that Casella's hands were empty and did not then fear the presence of a weapon, as is evidenced by their holstering of their own guns and putting themselves in close proximity to Casella.

Appellant emphasizes some aspects of the officers' testimony that detract from their credibility, or at least could justify a reasonable jury so finding. Wing and Skyrm would have the altercation with Casella, and all blows inflicted on him, occur in the narrow passage behind the shed. Kerpelman, on the other hand, admitted that he had struck Casella in the yard outside the defile. A civilian witness saw blood only in the yard. We have examined the photographs of the passage, and must

strain to find room for five adults and a dog to stand, let alone to fight, swing a blackjack, or lunge for a gun. The location of the struggle is important because the officers emphasize the dark, "close quarters" nature of the arrest scene. In addition, appellant points out that the officers gave inconsistent testimony as to who removed Obloy from the hiding place.

Finally, even if it found that force was necessary to arrest Casella, a reasonable jury could nonetheless find the *degree* of force excessive. The *only* blackjack-inflicted lacerations were on Casella's head. There is no medical evidence that he was struck anywhere else, though none of the officers admitted intending to strike him on the head.

Casella was nearly beaten to death. There are, perhaps, occasions when such a severe degree of force is objectively reasonable. However, summary judgment is appropriate only if the undisputed facts portray an extraordinary situation that justified the extraordinary force. They do not in this case.

We reverse the summary judgment for the appellee officers.

### III.

The county's § 1983 liability is derivative of, but narrower than, the officers'. Appellant can prevail only if excessive force was used against Casella, and this use of force was caused by an unconstitutional custom or practice of the county. *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir.1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). Of course, written policies are carefully crafted to be constitutional, and a plaintiff must usually prove the existence of some unpublished practice. In the police brutality context, two theories predominate:

> The principal theory locates fault in deficient programs in police training and supervision which are claimed to have resulted in constitutional violations by untrained or mistrained police officers. A second theory, sometimes imprecisely

subsumed under the first, locates fault in irresponsible failure by municipal policymakers to put a stop to or correct a widespread pattern of unconstitutional conduct by police officers of which the specific violation is simply an example.

*Id.* at 1389. Appellant posits the second theory. She argues that Prince George's County has failed to maintain adequate internal checks on excessive use of force and has thereby allowed it to become a pattern.

We find the propriety of the county's summary judgment a closer call than the officers'. The county's written "standard" policies are exemplary, and are glowingly detailed by appellees. However, appellant cites numerous particular incidents of excessive force, including one that resulted in a jury verdict against officers and another that was allegedly settled for a large amount.

Appellant also presents statistics showing that the percentage of excessive force complaints sustained through the county's administrative investigation has been minimal in comparison with the rather large percentage of other citizen complaints that have been sustained.

Finally, appellant points out that Commander's Information Reports (CIRs), which detail the results of internal investigations into every use of force, including dog bites, are kept for six months and then destroyed. Another county policy forbids taking photographs of dog bites. Appellant argues that these practices create the impression among officers that wrongdoing will not be documented.

Appellant will have more difficult problems of proof in her claim against the county. Nonetheless, if she can prove the numerous instances of excessive force she alleges, in conjunction with the circumstantial evidence of a "circle the tents" approach to police brutality complaints, we think a fair-minded jury could find that the county has a custom or practice of letting incidents of excessive force go unpunished.

The judgment is reversed, and the case is remanded for further proceedings.[2]

REVERSED AND REMANDED.

---

**2.** The district court dismissed the state law claims by declining to exercise its pendent jurisdiction after dismissing the federal claims. Be- cause the district court's jurisdiction is restored by our reversal, the dismissal of the state claims is also reversed, and they are reinstated.