MICHAEL, Circuit Judge,
dissenting in part and concurring in part:
I respectfully dissent from the majority’s decision that Officer Johnathan Greene is entitled to qualified immunity. An objectively reasonable police officer would not use a find-and-bite dog to conduct a hasty and limited search for a missing thirteen-year-old boy who is highly intoxicated, harmless, and not wanted for a serious crime. The danger to the boy of using such a dog was well known long before this case:
With the bite-and-hold technique, K-9 dogs are trained to bite and hold the suspect until commanded to release the suspect by the law enforcement K-9 officer. The suspect often struggles to avoid pain, injury, and arrest, prompting the dog to regrasp and hold with greater bite force. With this technique, the K-9 dog continues to bite and hold regardless of what the suspect does (surrenders, stands still, or attempts to flee). Injury is almost inevitable.
H. Range Hutson et al., Law Enforcement K-9 Dog Bites: Injuries, Complications and Trends, 29 Annals of Emergency Med., 637, 638 (1997) (emphasis added). Oscar Melgar was seriously and perma *362 nently injured from the bite, re-bite, and grip of Officer Greene’s dog. Melgar had a clearly established Fourth Amendment right to be free from this method of seizure brought about by Officer Greene.
I.
As many eases document, find-and-bite police dogs have caused serious injury, disfigurement, and even death. See, e.g., Trammell v. Thomason, 335 Fed.Appx. 835, 836 (11th Cir.2009) (victim underwent four operations and was hospitalized for eighteen days after police dog repeatedly bit his throat); Crenshaw v. Lister, 556 F.3d 1283, 1286 (11th Cir.2009) (police dog bit victim 31 times) Grimes v. Yoos, 298 Fed.Appx. 916, 917 (11th Cir.2008) (police dog bite caused victim to lose 30 percent of his arm); Miller v. Clark County, 340 F.3d 959, 961 (9th Cir.2003) (police dog tore victim’s skin in “four places above the elbow” and “shredded” the muscles underneath); Vathekan v. Prince George’s County, 154 F.3d 173, 177 (4th Cir.1998) (police dog bite put victim in hospital for six days and caused permanent facial disfigurement); Kopf v. Wing, 942 F.2d 265, 267 (4th Cir.1991) (police dog “frightfully mauled” victim and caused “four scalp lacerations, a fractured skull, and a subdural hematoma”); Robinette v. Barnes, 854 F.2d 909, 911 (6th Cir.1988) (police dog bite to victim’s neck caused death); Gibson v. City of Clarksville, 860 F.Supp. 450, 453 (M.D.Tenn.1993) (police dog bite required victim to undergo two surgeries and skin graft).
Find-and-bite police dogs tend to be larger breeds, weighing 70 to 90 pounds or more. P.C. Meade, “Police Dog and Domestic Dog Bite Injuries: What are the Differences?,” 37 Injury Extra 395, 399 (2006), available at http://www. sciencedirect.com. These dogs are taught to inflict forceful bites using all of their teeth. Id. The force of a trained dog’s bite is between 1,200 and 2,000 pounds per square inch. Vathekan, 154 F.3d at 177 n. 3 (citing Douglas U. Rosenthal, Note, When K-9s Cause Chaos—An Examination of Police Dog Policies and Their Liabilities, 11 N.Y.L. Sch. J. Hum. Rts. 279, 296 (1994)). This amount of force is comparable to an automobile wheel running over a body part. Miller, 340 F.3d at 962.
Here, a bite injury to Melgar was practically certain. The unmuzzled dog was on a long, fifteen-foot leash and was therefore not under reasonable control by Officer Greene. Indeed, once the dog bit and held the boy’s leg, the officer was concerned about disengaging the dog before it bit the boy in the face with a disfiguring grip. As it was, the boy suffered deep lacerations above the ankle, which left permanent injury—a disruption of sensory nerves that causes particular discomfort during athletic activities, such as soccer.
II.
For an official’s conduct to violate clearly established law, a “prior case holding identical conduct to be unlawful is not required.” Vathekan, 154 F.3d at 179. “In evaluating whether an officer is entitled to qualified immunity on an excessive force claim, the question is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances.” Id. (internal citations and quotations omitted). The reasonableness of a “particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The focus is not on the officer’s “underlying intent or motivation.” Connor, 490 U.S. at 397, 109 S.Ct. 1865. An “officer’s good intentions” do not “make an objectively *363 unreasonable use of force constitutional.” Id.
The district court properly concluded that Melgar’s rights were clearly established by our decision in Kopf, a case in which a find-and-bite police dog “frightfully mauled” a suspect. 942 F.2d at 267. That decision does not, as the majority asserts, turn on the fact that the dog was released from its leash. Rather, there was a material factual dispute about the reasonableness of an officer’s use of a find- and-bite dog to capture a suspected felon who fled from a vehicle, hid behind a shed, and may have been armed. Id. at 266. Key factual issues in dispute included whether the suspect was surrounded by the police before the dog attacked, whether the suspect physically resisted the police, and whether the police realized that the suspect was unarmed. Id. at 268. These factual issues were important to the determination of whether the dog was improperly deployed under the circumstances—circumstances laden with danger that was not present here. The police in Kopf were responding to a serious crime, an armed robbery, and the objective was to arrest the suspect. Id. at 266. Yet we held that even if “force was necessary to arrest [the suspect], a reasonable jury could find the degree of force excessive.” Id. at 269.
The district court looked to Kopf as the relevant precedent rather than Vathekan, which focused on whether the officer issued a warning before releasing a find- and-bite dog. 154 F.3d at 180. Vathekan, however, was grounded on Kopf which we capsuled as follows: “In Kopf we held that the improper deployment of a police dog that mauls the target constitutes excessive force in violation of the Fourth Amendment.” Id. at 179 (citing Kopf, 942 F.2d at 268) (emphasis added). “Deployment,” of course, refers to the arrangement or use of a thing or force for a “deliberate purpose.” Merriam-Webster’s Collegiate Dictionary (11th ed.2007).
Officer Greene deployed his find-and-bite dog in part for the deliberate purpose of finding Melgar. As the majority recognizes, a seizure within the meaning of the Fourth Amendment occurred because the method used was “intentionally applied”; Melgar was seized “by the very instrumentality set in motion” to terminate his freedom of movement. Brower v. County of Inyo, 489 U.S. 593, 597, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). By the same token, Greene’s deployment of the dog was a deliberate use of force because he knew that if the dog made physical contact with Melgar, it would bite and hold him.
The district court correctly denied Greene qualified immunity because the facts proffered by Melgar show that the deployment of a find-and-bite dog amounted to the use of excessive force. Despite Greene’s futile hope that he could conduct a controlled, contact-free search for a teenager who he believed was in danger, his use of an unmuzzled find-and-bite dog on a long leash to execute this search was objectively unreasonable. First, Officer Greene was not attempting to find a fleeing adult who was suspected of committing a serious felony and might be armed. Although Melgar had illegally consumed alcohol, the search was “primarily for a missing person,” not a criminal suspect, as the majority concedes. Ante at 356. Mel-gar was harmless, unarmed, intoxicated, and lost—not attempting to evade arrest.
Second, Officer Greene’s use of the find- and-bite dog is not rendered reasonable by his subjective intent to “conduct a hasty search” and “not to spend a lot of time on [it].” J.A. 174, 176. Greene’s description of a “hasty search” indicates that the sitúa *364 tion did not call for the ultimate in aggressive measures—the use of a find-and-bite dog—notwithstanding the chilly temperature. He said that a key purpose of a “hasty search” is to gather information: “environmental information, information about the missing person, place last seen, et cetera.” J.A. 175. He recognized that there were obvious risks in using a find- and-bite dog to conduct a hasty search: “If a dog locates a person and the dog has been tasked with locating a person, whether it be on a track, an open-building search, [or] an off-lead search, the dog will, in the absence of a command, seize the person usually by a limb and hold on.” J.A. 180 (emphasis added). Greene’s knowledge that his dog was trained to bite targets without command renders immaterial the majority’s argument that the dog was not released from its leash. An unmuzzled find-and-bite dog searching in the dark with the considerable freedom of movement afforded by a fifteen-foot lead was not under “substantial control,” as the majority claims. Ante at 358.
Third, in light of what Officer Greene knew about Melgar and his companion, using a find-and-bite dog, with the attendant risk, was not warranted. Greene knew that Melgar’s companion was found passed out on the ground, that Melgar was probably intoxicated to about the same degree, and that Melgar might also be found “laying out” somewhere. J.A. 174. In these circumstances, allowing an unmuzzled dog on a long leash to search for Melgar invited a serious bite injury that was practically inevitable.
Officer Greene’s decision in this case was not in the “hazy border between excessive and acceptable force” so that a reasonable officer could not have known that he was violating the Fourth Amendment. Saucier v. Katz, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Greene’s decision and conduct were out of bounds. However good his intentions (which are irrelevant to the clearly established right analysis), Greene made an objectively unreasonable miscalculation when he concluded that he could stop the dog before it bit and injured Melgar. The situation merited police attention and effort to be sure, but Melgar was not suspected of a serious crime and he was not evading arrest. Although Melgar was at some risk, the degree of risk did not justify the use of a dog trained for one task: finding, biting, and furiously holding on to the target.
III.
I concur in the majority’s determination that Officer Greene seized Melgar with the dog. Moreover, I am somewhat encouraged by the majority’s refusal to “say as a matter of law that no constitutional violation occurred,” ante at 355, and its statement that “the obvious need is to strike a balance between locating a missing and possibly endangered individual and avoiding injury to that person when located,” id. at 357. Still, the majority holds that Officer Greene did not violate clearly established law. We should not inch toward clearly established law bite by disabling bite. Bolder action is called for today, and the basis for that action is the widely known danger that find-and-bite dogs present. It is already clearly established that the improper deployment of a find- and-bite dog that mauls its target constitutes excessive force in violation of the Fourth Amendment. Kopf 942 F.2d at 268. A police officer’s deliberate use of such a dog to search for a missing and harmless boy like Melgar violates this clearly established right.