PAMELA HARRIS, Circuit Judge,
dissenting:
As my colleagues in the majority recognize, this is a most unfortunate case. Because he was homeless, Mr. Maney found himself “in the wrong place at the wrong time,” Maj. Op. at 215[1]: outside a vacant house thought to shelter the suspect in an unarmed robbery. Maney was not himself suspected of any crime, armed or not, and he did not attempt to flee or to resist. Nevertheless, Officer Garrison deliberately subjected him to a canine attack in order to rule out any possibility that he might pose a threat. Whether or not a more customary Terry stop might have been authorized, I think it is clear enough that the circumstances did not justify the sustained mauling of Maney.
Clear enough, that is, to warrant denial of qualified immunity to Garrison on Ma-neas excessive force claim. As the majority cogently explains, even if Garrison violated the Fourth Amendment when he decided to allow his dog to continue attacking Maney, qualified immunity will protect him from liability unless the Fourth Amendment right in question was “clearly established” at the time of the events in question. Maj. Op. at 215-16. The “border between excessive and acceptable force” can be a “hazy” one, Saucier v. Katz, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), and where the question is close, then it cannot be said that “any reasonable official in the defendant’s shoes would have understood” that he was outside constitutional bounds, Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014), as is required before liability may be imposed.
There is one question in this case that might qualify as a close one, and that is *229 whether Garrison was justified in seizing Maney at all, let alone by way of canine attack. For present purposes, I will credit Garrison’s account of events, which has Bikkel, Garrison’s dog, launching the attack on Maney on his own initiative and to Garrison’s surprise. And on that premise, I will assume that no seizure occurred until Garrison—again, by his own testimony— observed the attack and determined that Maney was not his suspect, and then intentionally let the mauling continue until Ma-ney could show his hands and demonstrate that he was unarmed. See Brower v. Cty. of Inyo, 489 U.S. 593, 596-97, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (Fourth Amendment seizure occurs when officer terminates freedom of movement through means intentionally applied); Maj. Op. at 218-19.[2] But there is no dispute that there was in fact a seizure here, and that means that the threshold question in this case, before we even get to the use of force, is why Garrison was entitled to detain Maney in the first place.
With no help from Garrison, who fails to address this question altogether, the majority posits that Maney’s seizure was authorized by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which allows for a brief investigative stop on reasonable suspicion of criminal activity. Although Garrison knew that Maney was not the unarmed robbery suspect he was tracking—and also that no accomplice to that unarmed robbery had been reported—he might reasonably have believed, according to the majority, that Maney was involved in a crime. Maj. Op. at 219-20.
I think the better view is that there was not reasonable suspicion sufficient to support a Terry stop in this case. As the majority recognizes, Maj. Op. at 219-20, “an individual’s mere presence in an area of expected criminal activity ... is not enough to support a reasonable, particularized suspicion that the person is committing a crime.” United States v. Bumpers, 705 F.3d 168, 171-72 (4th Cir. 2013) (internal quotation marks omitted). And that is mostly what this case is about: Maney’s unfortunate presence outside the house to which Garrison had tracked his suspect. The only other factor relied on by Garrison was that Maney was not exhibiting “normal bystander behavior,” J.A. 169—that is, Maney was crouched in the bushes near an abandoned house at a little after 10:00 p.m. and did not identify himself to the police.[3] *230 But Garrison had just passed through what he knew to be a homeless camp, approximately 150 yards away, so he was aware that there was a perfectly innocent explanation for Maney’s presence near the abandoned house. And I would not count against Maney his failure to stand and identify himself, which Maney—quite reasonably, in hindsight—attributes to his fear that a sudden movement might prompt a dog attack. Citizens are under no free-standing obligation to identify themselves to the police, see Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (overturning defendant’s conviction for refusing to stop and identify himself to police), and it was Garrison who failed to give the standard announcement or warning—the same one he gave while tracking through the homeless camp—that would have put Maney on notice that he should speak up and allowed him to come forward in safety.
That is the question that this case should be about: whether Maney’s presence at the scene of the police action justified a brief investigative Terry stop based on reasonable suspicion. Had events unfolded as they should have—had Garrison seen Maney and detained him without deploying Bikkel, or ended Bikkel’s attack as soon as possible but further detained Ma-ney to ensure that he posed no threat— then we could have the customary debate about whether there was reasonable suspicion sufficient to support a Terry stop. In my opinion, there was not. But this is a qualified immunity case, and I will assume, arguendo, that whether a standard Terry stop was justified is not “beyond debate,” Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011), as required to defeat qualified immunity.
A standard Terry stop, of course, is not what happened here. Garrison did not end the attack on Maney as soon as he realized that Bikkel was biting a man who was not his suspect, and then detain Maney by ordinary means. Instead, he made the deliberate decision to detain Maney by way of an ongoing canine attack, until Maney could show his hands and satisfy Garrison that he was not armed. And at that point in the proceedings—when Garrison, by his own account, intentionally prolonged a violent assault on Maney to determine whether he might pose a threat—I believe we have run out of close questions of law.
First, no reasonable officer could think that he was entitled to effectuate a Terry stop by way of canine attack. On this point, Terry and its progeny are perfectly clear. Terry carves out an exception to the general rule that seizures of the person must be justified by probable cause, allowing for brief investigative stops on the lesser standard of reasonable suspicion. 392 U.S. at 21-22, 88 S.Ct. 1868. But precisely because a Terry stop requires only reasonable suspicion and not probable cause for an arrest, Terry authorizes only a carefully “limited intrusion on the personal security of the suspect,” Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (police exceeded limited intrusion allowed on reasonable suspicion when they removed suspect from public area of airport and detained him in private room for questioning)—classically, an approach on the street to question a suspect about his conduct, see Terry, 392 U.S. at 23, 88 S.Ct. 1868. And Terry itself addresses the question of what an officer may do to protect his safety during such a stop: If and only if the officer has an objective and articulable reasonable suspicion that a suspect is armed and dangerous—a standard that nobody argues was met in this case—then the officer may conduct a limited pat-down of a suspect’s outer clothing for a weapon, and that is all. Id. at 24-25, 88 S.Ct. 1868.
*231 The gap between what Terry allows on reasonable suspicion and what transpired in this case is so vast that no reasonable officer could have failed to appreciate the difference. Any suggestion that a police officer, operating only on reasonable suspicion and without probable cause, and with no objective basis for believing a suspect to be armed—no report of a crime involving a weapon, no weapon or suspicious bulge observed, not even a furtive gesture—could skip past the stop and question, past the frisk, and go directly to canine attack under the auspices of Terry simply cannot be credited.
It is true, as the majority explains, that officers conducting Terry stops may use “such reasonable force as may be necessary” to effectuate the stop. United States v. Haye, 825 F.2d 32, 35 (4th Cir. 1987). But any such use of force must be consistent with the general Terry framework described above, which, again, allows only for significantly limited intrusions on personal freedom and security, in light of the fact that there is no probable cause of criminal activity. That is why, as the cases cited by the majority make clear, Maj. Op. at 220-21, the hard questions in this area are about things like displays of force—we have permitted officers to draw weapons during a Terry stop, see United States v. Sinclair, 983 F.2d 598, 602 (4th Cir. 1993), but have described the practice as an “extraordinary measure[],” United States v. Taylor, 857 F.2d 210, 213-14 (4th Cir. 1988)—and the use of handcuffs to restrain a suspect known to be armed, see Young v. Prince George’s Cty., 355 F.3d 751, 755 (4th Cir. 2004). Use of a canine attack in a reasonable-suspicion stop, where a suspect is not resisting, attempting to flee, or otherwise making extraordinary measures “necessary,” is not a hard question, and it cannot be reconciled with settled understandings about the limited nature of the intrusion permitted by Terry.
I do not want to belabor what I think is an obvious point. But this is an issue on which we must not allow confusion or excuse error. Because they are permitted on less than probable cause, Terry stops are exceedingly common; in New York City alone, police conducted 4.4 million reasonable-suspicion stops between January 2004 and June 2012. Floyd v. City of New York, 959 F.Supp.2d 540, 556 (S.D.N.Y. 2013). Countless citizens who ultimately will be found to have committed no crime are subject to Terry stops on a daily basis. No police officer should be under the impression that whether canine attacks may be used to carry out those stops, as a first resort against suspects who are neither fleeing nor resisting, is an open or difficult question.
Second, even if we were to hypothesize some other justification for Maney’s seizure, so that Terry’s restrictions do not apply, it would remain clear that the Fourth Amendment’s more general limits on the use of force were exceeded here. Whatever the imagined alternative basis for Maney’s seizure—and assuming, for the sake of argument, that there was one, despite the undisputed absence of probable cause—use of force in its effectuation would be subject .to the “objective reasonableness” test of Graham v. Connor, 490 U.S. 386, 394-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). And while many Graham cases present close questions, this is not one of them.
On one side of the Graham balance, we have the degree of force used against Ma-ney. See 490 U.S. at 396, 109 S.Ct. 1865 (balancing “nature and quality of the intrusion on the individual’s Fourth Amendment interests” against countervailing government interests); Turmon v. Jordan, 405 F.3d 202, 207 (4th Cir. 2005) (nature of intrusion on individual interests generally *232 measured by the amount of force employed, with consideration of extent of injuries). A mauling by a police dog is not only terrifying for the subject but also likely to inflict severe injury; as we have explained, “[t]he force of a police dog’s bite is between 1,200 and 2,000 pounds per square inch,” Vathekan v. Prince George’s Cty., 154 F.3d 173, 177 n.3 (4th Cir. 1998). In this case, Garrison’s dog first bit the top of Maney’s head, tearing away a two-square-inch section of hah-, skin, and tissue. This wound ultimately required a fifteen-and-three-quarter-inch skin graft. Then, as Maney pleaded with the police to stop the attack, the dog bit Maney twice more, causing deep wounds on his left arm and left thigh. Those injuries led to a brachial artery blood clot and profuse bleeding, bruising, and swelling.
And on the other side of the balance, we have the weight of the government interest in prolonging the canine attack on Ma-ney, rather than ending the attack and substituting normal means of detention. See Graham, 490 U.S. at 396, 109 S.Ct. 1865. That interest is to be evaluated in light of the totality of the circumstances and with special attention to the so-called Graham “factors”: “the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Id. And as the district court held, not one of those factors can explain why it was necessary or constitutionally reasonable to employ a canine attack against Maney once Garrison realized that Maney was not his suspect. At that point, “there was no crime at issue associated with [Maney],” severe or not, that could justify this level of force. J.A. 379. Nor was there any objective reason to suspect Maney of being a threat, notwithstanding Garrison’s “contention that hiding from police is not normal bystander conduct,” J.A. 380; again, Garrison, who was responding to a call on an unarmed robbery, saw nothing'—not a weapon, not a bulge, not a movement—to indicate that Maney was armed. And finally, Maney was not fleeing from the police when force was deployed, or otherwise resisting efforts to detain him. Id. Perhaps Garrison reasonably could have believed that Maney’s presence on the scene and failure to identify himself justified a brief investigative stop. But under Graham, there is simply nothing—not one factor—that could have led a reasonable officer to think that he could use the level of force associated with a canine attack to carry out that investigation.[4]
Third, the sudden and fast-moving nature of Garrison’s encounter with Maney does not compel a different result. It is true, as Graham instructs and the majority explains, that “[b]eeause ‘police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving,’ the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided.” Waterman v. Batton, 393 F.3d 471, 476-77 (4th Cir. 2005) (citation omitted) (quoting Graham, 490 U.S. at 397, 109 S.Ct. 1865); see Maj. Op. at 221, 222-23. But the problem here is not facts discovered after the *233 events in question, with the luxury of hindsight; it is that on the facts as perceived by Garrison himself, at the scene and in the heat of the moment, no reasonable officer could have thought that the Fourth Amendment allowed him to extend Bikk-el’s violent attack on Maney.
This not a case, that is, in which things moved so quickly that Garrison was powerless to discern or respond to changing circumstances. On the contrary. Garrison testified that notwithstanding the commotion surrounding Bikkel’s initial attack on Maney, he came to a deliberate decision to permit the canine—undisputedly on a lead and within his control—to continue mauling Maney until Maney showed his hands. The tense conditions of the encounter did not prevent Garrison from ascertaining, correctly, that the man being mauled— white and not bald—was not his bald, African-American suspect. And they did not cause Garrison to misperceive the existence of a weapon, or even a gesture that might have been a reach for a weapon. Cf. Anderson v. Russell, 247 F.3d 125, 130 (4th Cir. 2001) (because facts are viewed “from the perspective of the officer” under Graham, use of deadly force justified where officer reasonably but incorrectly perceived subject to be armed and reaching for a gun); Waterman, 393 F.3d at 477-80 (given split-second nature of decision, use of deadly force justified where officers reasonably perceived vehicle lurching forward as assault on them).
What Garrison got wrong was not the facts, but the law: It is not the case, as Garrison appears to have believed, that— in the absence of probable cause, an attempt to flee or resist, or even a mistaken perception of a weapon or threatening gesture—Maney could be subjected to a canine attack for failure to exhibit “normal bystander behavior” at the scene of a police investigation into an unarmed robbery. J.A. 169. And that kind of legal misjudgment, we have made clear, will not render the use of force reasonable, no matter how pressing the circumstances. Even in the most rapidly evolving and fraught encounters, lasting no more than moments and involving perceived threats far graver than the one Garrison believed himself to be facing, police officers are charged with applying Fourth Amendment use-of-force restrictions on a second-by-second basis, and responding immediately to changed circumstances or new information. See Waterman, 393 F.3d at 481 (“[Fjorce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated”); Brockington v. Boykins, 637 F.3d 503, 507 (4th Cir. 2011) (deadly force justified at start of encounter no longer justified seconds later). Bikkel’s attack on Ma-ney may have been brief[5] and tumultuous, and—crediting Garrison’s account—it may have begun as an unintentional restraint and thus a non-seizure for Fourth Amendment purposes. But “parsing] the sequence of events as they oecur[red],” *234 Brockington, 637 F.3d at 507, what matters is the precise moment in which Garrison consciously decided to allow Bikkel to continue mauling a non-suspect in his unarmed robbery case.- And at that moment, on the facts as he perceived them, Garrison made an objectively unreasonable legal judgment.
Finally, as I have said already, I do not believe that this case falls within a “gray area,” see id. at 508, entitling Garrison to qualified immunity because the Fourth Amendment limits he exceeded were not sufficiently “clearly established” to put him on notice. Our qualified immunity analysis takes into account “not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked.” Amaechi v. West, 237 F.3d 356, 362-63 (4th Cir. 2001); see Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (officials can “be on notice that their conduct violates established law even in novel factual circumstances”). And for the reasons given above, my view is that the “core constitutional principiéis]” and doctrine articulated in Terry and Graham make manifest that canine attacks may not be used in the first instance to seize suspects on, at best, reasonable suspicion, and without objective indicia of a weapon.
But if more were required, then I believe it is provided by our cases dealing’ directly with police canine attacks. Those cases clearly establish that Graham’s objective reasonableness standard applies to police canine attacks, see Vathekan, 154 F,3d at 178; that even the weighty government interest in apprehending armed and fleeing robbery suspects may not be enough to justify a canine attack under Graham, see Kopf v. Wing, 942 F.2d 265, 266, 268-69 (4th Cir. 1991); and that dog attacks are no exception to the rule that even in a fast-moving and tense situation, a use of force that is excusable at one moment may become unreasonable at the next, and that officers are obliged to respond accordingly, see id. at 268 (perception that suspect was armed might justify initial dog attack, but not continuation once officers fail to see weapon). And even if that were not sufficient, there still would be our determination in Vathekan that a police officer may not use a canine attack as a first resort against a person found on the scene of a suspected burglary—after a resident has assured the police that no innocent person should be on the premises—in order to rule out the possibility that he or she is a burglar or otherwise poses a threat. 154 F.3d at 176-79. Unless we are going to require that the precise conduct at issue already have been held unlawful in order to defeat qualified immunity—which we do not, see id. at 179—then surely this is close enough.[6]
And then, finally, there is common sense. See Brockington, 637 F.3d at 508. Garrison was tracking an unarmed-robbery suspect with no reported accomplice at around 10:00 p.m., while accompanied by a second police officer and a police *235 canine. While I do not doubt that finding Maney crouched outside a vacant house may have been startling and even frightening—notwithstanding Garrison’s awareness of the homeless camp in the immediate vicinity-common sense would dictate that use of a violent canine attack to address those fears was an overreaction. And if there is a paucity of case law addressing the intentional use of a police canine attack against a non-fleeing, non-resisting, non-suspect in a non-armed robbery, common sense tells us that this is because the principles of Terry and Graham are sufficiently clear that no reasonable police officer could so badly misjudge their application.
In the end, what is missing from this case is any sense of proportionality, the touchstone of Graham’s objective reasonableness standard. See Vathekan, 154 F.3d at 179. Garrison imposed an enormous cost on Maney when he allowed Bikkel to continue his savage attack. He did so intentionally, knowing that Maney was not the suspect he was tracking, without any indication that Maney was armed, and absent any resistance by Maney, in order to address an inchoate concern that Maney nevertheless might pose some threat. Because I believe that the Fourth Amendment unmistakably renders that response disproportionate and excessive, I must respectfully dissent.

. "Maj, Op.” refers to the majority opinion, and "Cone. Op.” to the concurring opinion.

. In fact, there remains a material dispute as to precisely when Garrison saw Maney and recognized that he was not the robbery suspect. As noted above, Garrison claims that he realized Maney was present only after the canine attack already was in progress. But a reasonable jury crediting Maney’s version of events could find otherwise. Because Maney contends that the bushes in which he was crouched were "devoid of foliage and leaves,” J.A. 229, and that the area was lit by two streetlights, it is reasonable to infer that Ma-ney was visible to Garrison before the attack. Whether Garrison saw Maney before or after Bikkel’s attack began bears materially on the reasonableness of Garrison’s actions, making summary judgment inappropriate.

. At no point in his deposition did Garrison suggest that he believed that Maney and his suspect had close contact while working together, leading Bikkel to confuse Maney’s scent with the suspect’s. Cf. Maj. Op. at 219-20; Cone. Op. at 225. Instead, Garrison attributed Bikkel’s attack on Maney solely to the fact that Maney happened to find himself in proximity to a suspect hiding under the house: "[Tjhe way the wind was blowing, [the suspect’s] odor was conjugating up where all the bushes were, where Mr. Maney was hiding." J.A. 278. But that explanation'is called into question by the fact that Garrison never bothered to look under the house for the suspect he allegedly believed to be hiding there. So a reasonable jury could conclude that what Garrison actually understood was that Bikkel simply had made a mistake, and that his suspect was nowhere on the premises.

. The concurring opinion applies the Graham factors not to Maney but to the unarmed robbery suspect Garrison was tracking, and concludes that a reasonable officer could have believed himself authorized to subject that suspect to a canine attack. Cone. Op. at 224-25. I have my doubts. But regardless, that is not the question in this case. What matters here is whether Garrison acted reasonably under Graham when he decided to extend a violent attack against a person he recognized was not the suspect for whom he was searching.

. It is worth noting that under the majority’s rule, as I understand it, the brevity of Bikkel's attack on Maney may be a virtue, but it is not a necessity. For the majority, what makes this case a close enough question to trigger qualified immunity is not that Garrison ended the attack on Maney seconds after deciding to allow it; it is that Garrison ended the attack as soon as he had satisfied himself that Maney did not pose a threat. Maj. Op. at 221; see Cone. Op. at 226. Had it taken longer for Garrison to assure himself that Maney meant him no harm—had, for instance, Bikkel’s attack prevented Maney from showing his hands quickly, as a police canine attack often will do, see Kopf v. Wing, 942 F.2d 265, 268 (4th Cir. 1991) (reasonable jury could find it objectively unreasonable to require person to show his hands and surrender while being attacked by police dog)—then the duration of the attack could have been extended accordingly.

. In Vathekan, the particular conduct at issue was a police officer’s failure to "enable innocent persons to exit the area" by giving a verbal warning before unleashing his dog. See 154 F.3d at 176. And in its assessment of Vathekan, the majority focuses on the distinction between on- and off-leash status and the requirement of an off-leash warning. Maj. Op. at 215-16; Cone. Op. at 227-28, But the point is that an off-leash warning is required in order to avoid the unintentional mauling of "innocent persons,” 154 F,3d at 176—even those who appear to have no legitimate reason for being on the scene of a suspected crime. No reasonable officer could fail to understand that the same principle, a fortiori, would prohibit Garrison’s intentional decision to allow the continued mauling of Maney.