PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOSE R. MELGAR, parent and
guardian of Oscar Melgar,

　　　　　　*Plaintiff-Appellee,*

　　　　v.

JOHN GREENE, Officer;
MONTGOMERY COUNTY, MARYLAND,

　　　　　　*Defendants-Appellants.*

No. 08-2393

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:07-cv-02988-PJM)

Argued: October 29, 2009

Decided: January 29, 2010

Before WILKINSON, MICHAEL, and AGEE,
Circuit Judges.

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee joined. Judge Michael wrote a separate opinion dissenting in part and concurring in part.

## COUNSEL

**ARGUED**: William Antoine Snoddy, OFFICE OF THE COUNTY ATTORNEY FOR MONTGOMERY COUNTY,

MARYLAND, Rockville, Maryland, for Appellants. Terrell Roberts, ROBERTS & WOOD, Riverdale, Maryland, for Appellee. **ON BRIEF:** Leon Rodriguez, County Attorney, Marc P. Hansen, Deputy County Attorney, Edward B. Lattner, Chief, Division of Human Resources & Appeals, OFFICE OF THE COUNTY ATTORNEY FOR MONTGOMERY COUNTY, MARYLAND, Rockville, Maryland, for Appellants.

---

**OPINION**

WILKINSON, Circuit Judge:

In this case, we address the Fourth Amendment claim of a lost and intoxicated thirteen-year-old boy who was accidentally bitten by a police patrol dog used by an officer to find him. The boy's father, Appellee Jose Melgar, sued the canine officer under 42 U.S.C. § 1983 and sued the officer and the police department under Article 26 of the Maryland Declaration of Rights. While we cannot accept the officer's contentions on the merits of plaintiff's Fourth Amendment claim, we do think he is entitled to qualified immunity in this case. As to the state claim, we remand for dismissal without prejudice to plaintiff's right to proceed in state court.

I.

Around 7:00 p.m. on the night of March 17, 2006, Oscar Melgar, then thirteen years old, learned about a birthday party from his friend, Brian Bentacur. Oscar received permission from his mother to go to the party with Brian, and Brian's mother agreed to take the boys. The party was in Gaithersburg, Maryland, approximately thirty minutes from Oscar's home in Rockville, Maryland.

Brian's mother picked up Oscar around 8:15 p.m., and the boys arrived at the party around 8:45 p.m. Approximately

thirty minutes after the boys arrived, an older youth, who was about seventeen years old, started pouring mixed alcoholic beverages of rum and cola. The beverages were served in eight-ounce cups. Oscar knew he was being served alcohol, although he had never had a drink before. Within ten minutes of his first drink, Oscar consumed two additional eight-ounce rum and colas. He began to feel the effects of the alcohol in the middle of his third drink but still finished it.

Brian also was drinking, and one of the girls at the party complained that he was becoming "too touchy." Oscar was told to take Brian outside to "walk it off."

The outside temperature was in the upper thirties or lower forties, and even Oscar later admitted that it was cold. Oscar was wearing jeans and had a green warm-up jacket over his shirt. Brian wore jeans but only had on a long sleeved shirt.

The boys started walking, intending to circle the block, but they were not familiar with the neighborhood and got lost. As they walked, Oscar could feel the effects of the alcohol growing stronger, and Oscar testified that Brian also appeared to be growing increasingly intoxicated.

The two boys eventually sat down on a lawn. Oscar had a phone but wanted to sober up before calling Brian's mother to pick them up. After sitting on the lawn for a few minutes, Oscar saw a man walking a dog approaching. Oscar, who admits he was drunk and not thinking straight by this point, got up and walked away. He crossed the street, headed down a sidewalk, and eventually crossed a lawn toward a home, where he passed out under a holly bush. He stated that he went under the bush "so nobody could see me drunk." His last recollection was "getting cold, and trying to get warm."

Around 10:40 p.m., Jessica and Michael Sommerville were walking together when they discovered Brian Betancur lying on the ground. Ms. Sommerville testified that she saw another

boy stumble away from Brian as they approached. Ms. Sommerville did not recognize Brian, and she began to question him. She testified that Brian did not appear to be aware of the cold weather, even though he was only wearing a tee shirt. In addition, his speech slurred at times during their conversation, although at other times it was clear. Because the situation appeared unusual, Mr. Sommerville called 911 and reported finding a boy lying on the ground.

Both paramedics and the Montgomery County Police Department responded to the call. Officer Todd Uvary, the first officer to respond, saw that Brian Betancur "was extremely intoxicated" and had vomited and urinated on himself. He was told by paramedics that Brian was suffering from hypothermia and a possible alcohol overdose. Both Sommervilles told the police about the other boy they had seen, and Ms. Sommerville described his clothes. She also told the police that he stumbled away and sounded like he was vomiting, although Oscar later denied being sick. Officer Uvary communicated this information to the next two officers to arrive, Officers Holland and Camp. Concerned about the possibility that another intoxicated, lightly clothed boy could be outside, the three officers circled the neighborhood for approximately twenty minutes, using spotlights mounted on their cars to look in yards. At least one officer also got out of his car with a flashlight and looked in back yards.

As the officers were unsuccessful in the initial search, Officer Camp called a sergeant for advice and was told that it would be acceptable to bring a canine unit to the scene. Officer Camp called one of the appellants, John Greene, who was dispatched at 11:27 p.m. When Greene arrived, the other officers told him that Oscar was last seen approximately an hour earlier and that they had already made an unsuccessful search on foot and by car. Greene also was told that Brian had been taken by ambulance to the hospital for possible alcohol poisoning and hypothermia.

Greene decided to use his patrol dog, Carter, an animal trained to find individuals and to bite them when he came in contact, to make a quick search for the missing boy. While Greene normally would have used a bloodhound to perform such a search, his bloodhound was out of service with a knee injury. Because the police department's other bloodhound was off duty, Greene estimated it would have taken approximately another hour for it to respond. Additionally, because no scent item was available, a bloodhound search would have been difficult even if one had been available.

Greene also evaluated several other factors in reaching his decision. He considered that there was no definitive evidence that anyone was actually missing or endangered. However, if anyone was in fact missing, the cold weather, the presumed intoxication, and the elapsed time were all of serious concern. Greene also realized that no criminal suspect attempting to evade capture was involved, making it likely that he would see anyone before a dog got close enough to bite.

After deciding to use Carter to search, Greene put the dog on a fifteen foot lead. He did not muzzle Carter, and there is a factual dispute as to whether a muzzle would have significantly limited Carter's tracking ability.

Greene took Carter to the last point where Oscar was reported seen and commanded Carter to "track." Carter cast about looking for a scent and then began to track down the sidewalk. Greene began to call out to Oscar, saying he was there to help and to take him home. Oscar states he never heard anyone, but the district court gave no credence to his assertions because it recognized Oscar was inebriated and not in a condition to hear. After tracking a short distance down the sidewalk, Carter turned sharply across a yard and went into a holly bush where Greene could no longer see him. Greene did not interpret the turn as indicating that anyone was close. The lead went slack, and only then did Greene realize that Carter had found Oscar, who was asleep. By the time

Greene realized what was happening, the dog had already bitten Oscar's lower right leg.

Greene testified that he did not verbally call Carter off because Oscar was struggling, and Greene was concerned that if the dog released he might re-bite Oscar's face. Instead, Greene walked up the leash and physically removed the dog. While this was happening, the dog pulled Oscar some five or six feet. The parties dispute whether Greene pulled on the dog.

The parties also disagree about whether Oscar struggled; Green says that Oscar tried to pull his leg away from the dog, while Oscar claims he held still. Oscar claims that Carter bit him for fifteen or twenty seconds before he was removed. At some point during this time, Carter of his own accord released his grip momentarily and then bit Oscar a second time. Oscar suffered two lacerations on his lower right leg just above the ankle, one approximately 4.25 inches and the other 1.5 inches long.

Oscar's father, Jose Melgar, filed suit as Oscar's parent and guardian against defendants Officer Greene and Montgomery County, Maryland. Melgar alleged under 42 U.S.C. § 1983 that Greene violated Oscar's Fourth Amendment rights and raised a similar claim against Greene and Montgomery County under Article 26 of the Maryland Declaration of Rights. Two other claims were voluntarily dismissed and are not at issue here. Following discovery, defendants moved for summary judgment. The district court denied the motion, holding that a seizure "debatably" took place. It also declined to determine whether Greene's actions were reasonable under the Fourth Amendment or Maryland Declaration of Rights but noted that the issue was not appropriate for summary judgment. Finally, the district court declined to grant Officer Greene qualified immunity, and defendants timely appealed.

## II.

A district court's denial of qualified immunity is reviewed *de novo*. *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003). Following the Supreme Court's recent decision in *Pearson v. Callahan*, 129 S. Ct. 808, 821 (2009), we exercise our discretion to use the two-step procedure of *Saucier v. Katz*, 533 U.S. 194 (2001), that asks first whether a constitutional violation occurred and second whether the right violated was clearly established. At the summary judgment stage, this court draws inferences in the light most favorable to the plaintiff. *Waterman v. Batton*, 393 F.3d 471, 473 (4th Cir. 2005).

In this case, we address a narrow and specialized Fourth Amendment problem. We are not dealing with the use of a canine to track someone who is guilty of a serious criminal offense. Likewise, this was not a hunt for someone who could pose a threat to the community, nor was the person being sought an adult. Rather, we are dealing with a juvenile, and one, moreover, who was on foot and not in a car. Although underage drinking was involved, the facts of the case mark it as more of a search for a missing person than for any criminal at large.

The ground rules for this sort of specialized undertaking have not been sketched by courts in any kind of detail, and Greene argues that the district court misinterpreted the Fourth Amendment in two ways. First, he asserts that no seizure occurred because he did not terminate Oscar's freedom of movement through means intentionally applied. *See Brower v. County of Inyo*, 489 U.S. 593, 597 (1989). Second, Greene argues that even if a seizure occurred, his actions were objectively reasonable based on the circumstances known to him at the time and did not constitute excessive force. We address these arguments in turn.

## A.

As a preliminary matter, we must decide whether a seizure occurred. Officer Greene claims that he did not seize Oscar

with his dog because he did not intend to have Carter bite Oscar. Br. of Appellants 15. While we have no doubt that the bite was unintended, we nevertheless agree with the district court that Oscar was seized. We have noted that a seizure occurs even if officers "purposely detain a person under the mistaken impression that he is someone else," *Vathekan v. Prince George's County*, 154 F.3d 173, 178 (4th Cir. 1998), and it similarly follows that a seizure occurs if police purposely detain a person but somehow use more force than intended.

The Supreme Court has explained that a Fourth Amendment seizure requires "an intentional acquisition of physical control" which occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 596, 597 (1989) (emphasis in original). It has also explained that "a seizure occurs if 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (citing *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980) (Stewart, J., writing for a plurality)).

A government actor need not, however, seize an individual in the precise manner intended. As the Supreme Court put it in *Brower v. County of Inyo*:

> [W]e cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. *We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.*

489 U.S. at 598-99 (emphasis added). It is sufficient that "the detention is 'willful' and not merely the consequence of 'an

unknowing act.'" *Brendlin*, 551 U.S. at 254 (citing *Brower*, 489 U.S. at 596). In other words, so long as the *instrumentality* is intended, a seizure occurs even if the *degree* of the instrumentality's effectiveness was unanticipated.

In the present case, Officer Greene specifically used his dog to locate and stop Oscar. As such, Oscar was seized "by the very instrumentality set in motion . . . to achieve that result." *Brower*, 489 U.S. at 599. The fact that the seizure did not occur in quite the manner Officer Greene had envisioned does not change this fact, especially since Carter was trained to bite any individual he found when tracking.

It is true that the focus of Officer Greene's actions was on finding a missing and potentially endangered person, but there was also an element of criminality involved due to the possibility that Oscar had engaged in underage drinking. *See* Md. Code, Crim. Law, § 10-114 (prohibiting consumption of alcohol by individuals under 21); Md. Code, Crim. Law, § 10-117 (prohibiting service of alcohol to individuals under 21). Although there is every reason to believe that Greene's primary purpose was to help Oscar, the underlying alcohol consumption is sufficient to bring the actions of Officer Greene within the ambit of the Fourth Amendment and to support a finding that there was a seizure.

This is not the case of *County of Sacramento v. Lewis*, where no seizure occurred when police chasing a motorcycle accidentally ran over and killed the motorcycle's passenger. 523 U.S. 833 (1998). The Supreme Court explained that "where a 'pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit,' but accidentally stopped the suspect by crashing into him," *id.* at 844 (quoting *Brower*, 489 U.S. at 597), there was no "governmental termination of freedom of movement *through means intentionally applied.*" *Id.* (emphasis in original). In other words, the pursuit in *Lewis* was intended to bring about a stop by inducing the suspect to pull

over voluntarily, but police did not expect to physically restrain the suspect by hitting him with a police cruiser. In contrast, Officer Greene chose to use a dog conditioned to bite its target when found and thus cannot claim that there was no seizure when the dog he set in motion behaved exactly as it was trained to do.

## B.

Moving to the issue of excessive force under the Fourth Amendment, Greene argues that he was entitled to judgment as a matter of law because his decision to use a patrol dog to locate a possible missing person was objectively reasonable under the circumstances known at the time. While we appreciate the difficult situation in which the officer found himself, we cannot say as a matter of law that no constitutional violation occurred.

## 1.

It is well-established that "*all* claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original), including claims that police canines were improperly deployed. *Vathekan v. Prince George's County*, 154 F.3d 173, 178 (4th Cir. 1998). Reasonableness is evaluated from the officer's perspective, *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994), in recognition of the fact that officers cannot be expected to respond to information they did not possess at the time they acted.

Police are often forced to make split-second decisions, a factor which bears upon the reasonableness of their responses. *Graham*, 490 U.S. at 396-97. But even when split-second determinations are not involved, time constraints are still relevant to reasonableness determinations. *Waller v. City of Danville*, 556 F.3d 171, 175 (4th Cir. 2009). In this case, Officer

Greene did not face the time pressures present in the pursuit of armed criminals, *see*, *e.g.*, *Kopf v. Wing*, 942 F.2d 265, 266 (4th Cir. 1991), but he nevertheless reasonably believed he faced a ticking clock and the prospect of serious harm to the boy due to Oscar's presumed intoxication and exposure to the elements.

2.

Greene argues that his actions were objectively reasonable in light of a number of factors. He notes that he was summoned to assist a search late at night for a lightly clad, intoxicated teenager in cold weather. Greene knew that the individual had not been seen for an hour and that officers had already unsuccessfully searched the area in cars and on foot. He also knew that Brian Betancur, the missing teenager's companion, had been taken by ambulance to the hospital with possible alcohol poisoning and hypothermia.

Additionally, Greene points out that there was no reason to believe that anyone was actually in danger since police officers were relying on the statements of Jessica and Michael Sommerville, who had only briefly seen the missing individual. Because the person was not eluding pursuit as a criminal suspect, Greene believed he would likely be out in the open and visible before a dog could bite him.

Greene also argues that his behavior was objectively reasonable because no scent item was available, making a bloodhound search difficult. Even if police had a scent item, Greene's bloodhound was out of commission due to knee surgery, and it would have taken some time for the department's other bloodhound, which was not on duty at the time, to reach the area. Finally, Montgomery County Police Department police guidelines allow the use of patrol dogs to search for missing persons. Given all of these considerations, Greene argues that his decision to use a patrol dog to locate Oscar was reasonable, especially when the risk of death from hypo-

thermia was weighed against the unlikely possibility in Greene's view of a non-lethal dog bite. Br. of Appellants 18-20.

By any objective measure, then, Greene was in a difficult position. However, we do not think he is entitled to summary judgment on the merits of the issue of Fourth Amendment reasonableness. We recognize that police were searching primarily for a missing person and that canines have a role to play in such searches because of their keen sense of smell. Nevertheless, there are several significant factual questions in this case that make merits resolution of the excessive force claim inappropriate for summary judgment.

3.

Plaintiff identifies factual disagreements on at least three important points: the feasibility of muzzling Officer Greene's patrol dog, the reasonableness of the length of leash used, and whether Greene should have recognized from Carter's actions that the dog was close to Oscar.

First, the parties disagree about whether the use of a muzzle would have degraded Carter's tracking ability to the point where he would have been unable to perform his job. Officer Greene testified that his dogs were never trained to track while muzzled and that a muzzled dog would smell the inside of the muzzle instead of the scent it was attempting to follow. Plaintiff's expert disagreed, however, stating that a muzzle would have had only minimal impact on the dog's tracking abilities and that the failure to use a muzzle exposed Oscar to an unreasonable risk of being bitten.

Second, it is not clear whether the fifteen foot lead used in this case was needed or necessary. Greene and plaintiff's expert dispute the proper length of leash to be used in searching for missing persons. Greene claims that his use of a fifteen foot lead was necessary to give Carter sufficient room to cast

for scent and to track. The expert for plaintiff believes a shorter lead was warranted because the longer lead simply forfeited to too great an extent the officer's ability to control the animal. In fact, the length of leash leads appears to vary, with some officers using a shorter lead than in this case, *see Trammell v. Thomason*, 559 F. Supp. 2d 1281, 1284-85 (M.D. Fla. 2008) (officer used six foot lead to search for fleeing criminal suspect), and others using longer leashes. *See Peterson v. City of Federal Way*, No. C06-0036RSM, 2007 WL 2110336, at *1 (W.D. Wash. July 18, 2007) (officer used thirty foot lead to search for hit and run suspect with outstanding arrest warrants). While both of these cases involved serious criminal activity, they serve to demonstrate that the reasonableness of a particular lead length may well vary based on circumstances.

Finally, there is a dispute over when a reasonable officer should have realized that Carter was close to locating Oscar. Officer Greene testified that he did not realize that Oscar was near when his dog reversed course and cut across the yard right before entering the holly bush where Oscar was lying. Plaintiff's expert, however, stated that the shift in course was significant and that a reasonable officer should have realized what was occurring.

To reprise: Officer Greene faced a challenging situation due to nighttime weather conditions, Oscar's presumed intoxication, and the ever-lengthening time since Oscar was last seen. Officers also did not resort to the use of a patrol dog to locate a missing person until alternatives had been attempted unsuccessfully. At the same time, there are factual disputes regarding whether a muzzle, shorter lead, or more attentive handler could have reduced the likelihood of an injury occurring. The ground rules for such situations are not altogether clear, but the obvious need is to strike a balance between locating a missing and possibly endangered individual and avoiding injury to that person when located. In that regard, we

must address whether the import of the above discussion is one of future applicability or retrospective liability.

### III.

Having declined to rule as a matter of law in the first stage of the *Pearson*/*Saucier* analysis, our next question is whether Officer Greene's conduct violated clearly established federal law.

### A.

Qualified immunity provides officials with protection "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The goal of the doctrine is to balance two important concerns, first "the need to hold public officials accountable when they exercise power irresponsibly" and second "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). The purpose of the immunity is to allow some room for discretionary judgment in what are indisputably difficult circumstances and not to have the prospect of being blindsided in hindsight discourage officers from the constructive tasks they can in fact perform. *See Gooden v. Howard County*, 954 F.2d 960, 967 (4th Cir. 1992) (en banc). Thus officers will not be held liable, even if they violate statutory or constitutional rights, unless they had prior guidance which would allow them to determine that their contemplated action was improper.

While a decision directly on point is not required to put officials on notice of a "clearly established" right, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The

Supreme Court has cautioned against interpreting clearly established law too generally for fear of allowing plaintiffs "to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson*, 483 U.S. at 639.

In the present case, plaintiff references two prior decisions in arguing that Officer Greene's actions violated clearly established law, but their facts are simply not sufficiently similar to provide prior notice to Officer Greene that his actions were unreasonable. The decisions, *Kopf v. Wing*, 942 F.2d 265 (4th Cir. 1991), and *Vathekan v. Prince George's County*, 154 F.3d 173 (4th Cir. 1998), were both cases in which police dogs were *released from their leashes* by officers attempting to apprehend criminal suspects. *See Kopf*, 942 F.2d at 266 (police released dog in pursuit of armed robbery suspects); *Vathekan*, 154 F.3d at 176 (police released dog into home suspected to hide burglar). Those cases cannot fairly be understood as providing near-strict liability on officers any time they use police dogs. Rather, they must be understood in the context of the right actually addressed, which was "that failure to give a warning *before releasing* a police dog is objectively unreasonable in an excessive force context." *Vathekan*, 154 F.3d at 179 (emphasis added).

In striking contrast, Officer Greene kept Carter on a leash at all times and was not pursuing a dangerous criminal but was attempting to locate a missing person. There is a vast difference between an officer releasing a dog off a leash knowing with a good degree of certainty that it will find and bite its target and an officer exercising substantial control over a leashed animal with the expectation of being able to prevent any injury. Cases addressing the former simply do not provide sufficient guidance to officers in the latter situation.

Plaintiff also claims that Officer Greene violated clearly established law by failing to give a verbal warning. This claim was not even raised below and thus has been waived, *see*

Reply Br. of Appellants 6, but it is also unconvincing. While the *Vathekan* and *Kopf* decisions do establish that a warning is necessary before releasing a dog, 154 F.3d at 179; 942 F.2d at 268, this case does not involve that situation. Here, in fact, the officer expected his control over the animal by means of the leash would render any warning unnecessary. Moreover, Officer Greene did indeed call out to Oscar while using his dog to track. The district court declined to credit Oscar's assertion to the contrary, in large part because it recognized that he was unconscious in an alcohol-induced stupor at the time. Further, while plaintiff's expert suggested that a bull-horn or police car p.a. system should have been used to give a warning, there is no question that the expert's opinion does not reflect established law.

In an attempt to overcome these difficulties, plaintiff argues that Officer Greene's actions were professionally incompe-tent. Br. of Appellee 35. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly vio-late the law"). The only support plaintiff offers for this notion is a policy and accompanying commentary from the Interna-tional Association of Chiefs of Police (IACP).

As an initial matter, the opinion of the IACP obviously does not constitute clearly established law. Further, the IACP's policy explicitly allows the use of police canines "to track missing persons," so long as they "remain on a leash of sufficient length to provide a reasonable measure of safety to the subject of the search without compromising the canine's tracking abilities."

Even without such explicit authorization, we would be hard-pressed to say Officer Greene's actions were contrary to the IACP's standards. The language on which appellee relies merely notes that officers tracking a juvenile should "exercise . . . care" and "consider alternatives to the deployment of a canine." These directions simply do not prohibit the use of

patrol dogs to find missing juveniles. In essence, the instructions direct officers to proceed cautiously, and Greene did so. The uncontroverted evidence is that he considered alternatives to using his dog; he simply believed them inadequate.

Nor is appellee helped by the IACP's opinion that police departments should train their dogs to bark rather than to bite when they locate the target of a search. Montgomery County Police Department *does* have dogs that do not bite. It owned two bloodhounds in March 2006. Due to no fault of Officer Greene, one of the bloodhounds was unavailable due to surgery, and the other was far away. Officer Greene made use of the tools that were available to him on the night in question.

B.

In light of the foregoing principles, we hold that qualified immunity is appropriate because Officer Greene did not violate clearly established law in his search for a missing boy who faced serious potential injury. Police officers did not use a patrol dog as a first resort but rather first attempted a search without one. They then sought and obtained permission from their sergeant to call a dog. No bloodhound was available, and if Greene had waited for the department's off-duty canine handler and his bloodhound to be rousted out and brought to the scene, the police did not even have an item of Oscar's clothing to give the dog the scent. Time was not on the officers' side. The night was cold, and they were looking for a teenager who not only was lightly clothed but also whose condition was likely to be exacerbated by potential alcohol poisoning. Nor were these concerns illusory, given that officers knew that another youth had been taken to the hospital earlier in the evening intoxicated and suffering from exposure.

Operating under these difficult circumstances, Officer Greene attempted to assist in locating Oscar Melgar before excessive time elapsed. After weighing the risk of taking action against the danger of doing nothing, Greene resolved

to use the dog that he had available. To mitigate the risk of injury, he placed the dog on a leash. Because Oscar was not a fleeing criminal or wanted for a serious crime, Greene believed he would see Oscar and be able to curb his dog before any contact occurred. Had Oscar not by his own admission hidden in a bush due to embarrassment at his intoxicated state, it is likely Greene's assumption would have been correct. Similarly, the district court found that Greene called out to Oscar as he searched, quite reasonably rejecting Oscar's claims that he heard no such warnings in his inebriated state. That a biting occurred is truly unfortunate, but it was not due to Officer Greene violating clearly established law.

Something of a postscript may be in order here. As plaintiff's brief notes, on January 30, 2007 a neurologist examined Oscar's leg and "found two well healed scars on . . . the right ankle." Br. of Appellee 11. The doctor's prognosis was that:

> Oscar will have permanent disruption in sensation around the traumatic scars, and that he will need to wear an ankle brace to protect the area during all athletic activities indefinitely. Oscar plays soccer for a team, and he has discomfort in the ankle when he runs; the affected area of his leg is particularly sensitive when someone kicks it or it is hit by a ball.

Br. of Appellee 12 (paragraph breaks omitted). To repeat, it is regrettable that anyone was injured, but we will not penalize an officer whose actions in the face of limited time and uncertain legal principles may well have prevented a far darker result and conceivably even saved the boy's life.

### IV.

Our resolution of this case on grounds of qualified immunity is not a mere matter of semantics. Rather, it allows plaintiff to continue to pursue his state law claim under Article 26

of the Maryland Declaration of Rights, while a ruling on the merits would foreclose that possibility. Article 26 is interpreted *in pari materia* with the Fourth Amendment, *see Mazuz v. Maryland*, 442 F.3d 217, 231 (4th Cir. 2006) (abrogation on other grounds recognized by *Cole v. Buchanan County School Bd.*, 328 Fed. Appx. 204, 207 (4th Cir. 2009)); *Richardson v. McGriff*, 762 A.2d 48, 56 (Md. 2000), but Maryland's law of qualified immunity does not similarly track federal law. As the Maryland Court of Appeals has explained, "[p]roof that the official acted in objectively reasonable reliance on existing law, which would exempt an official from liability under § 1983, may be relevant to whether the official committed a violation [of Maryland law], but it does not provide an immunity should a violation be found." *DiPino v. Davis*, 729 A.2d 354, 371 (Md. 1999).

Nor have the parties briefed the issue of immunity under Maryland law, with the exception of a single short paragraph in appellee's brief. *See* Br. of Appellee 38. It appears that "Maryland common law qualified immunity . . . has no application in tort actions based upon alleged violations of state constitutional rights," *Lee v. Cline*, 863 A.2d 297, 305 (Md. 2004), but Maryland may or may not provide statutory immunity under the Maryland Tort Claims Act, at least with regard to government officials such as Officer Greene. *See id.* at 307-10 (ruling that Maryland Tort Claims Act applies to constitutional torts). Nevertheless, as the parties have not briefed the issue, and as we have already resolved the federal claim in this case, we decline to take the further step of deciding the extent to which immunity may be appropriate under Maryland law.

## V.

We conclude with a brief response to our colleague in dissent. The dissent notes mildly that Oscar Melgar was "at some risk" and apparently does not share our belief that the officer may have saved the plaintiff's life. *Post* at 26. Perhaps the

dissent is right. But perhaps not. The night had far to go when Oscar was found. It was a cold night to begin with, and temperatures have been known to drop between eleven in the evening and three or four in the morning. To leave a young boy with alcohol poisoning and hypothermia lying out in that environment is to risk tragic consequences, and no reasonable officer or person would have wished the night to end that way.

The dissent notes a number of cases in which dogs have inflicted bites, but that is not the point. For reasons earlier expressed and due to circumstances beyond his control, the officer did not have at his disposal the ideal canine. What alternatives does the dissent contend were available to Officer Greene, and why does the dissent believe those alternatives were as effective? What exactly would the dissent have the officer do? Does the dissent believe a reasonable officer, perhaps fearing liability, should simply have abandoned Oscar to his fate? Why would the dissent deny the individual officer qualified immunity when the plaintiff's state claim may proceed against both the public entity and the officer in state court? Does the dissent suggest that the absence of an ideal canine is the individual officer's fault or that the officer should somehow have financed a full complement of canines out of his own pocket? Our friend in dissent asks that the majority take "[b]older action." *Post* at 27. We ask simply that a modest respect for this officer's predicament be accorded before denying him the immunity that the Supreme Court states should be available "to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

We do, of course, recognize that objective reasonableness is the appropriate standard here, and indeed it is the one we have applied. The dissent is surely right that "an officer's good intentions" do not make objectively unreasonable acts constitutional. *Post* at 23. By the same token, however, undisputed good intentions should not be used to make an officer

a *more* inviting target for monetary damages. As to this officer, let it be said that he acted, not perfectly perhaps, in the lens of leisured hindsight, but that he did the best he could with what he had. For each of us, that's not so bad an epitaph.

VI.

For the foregoing reasons, we hold that Officer Greene is entitled to qualified immunity on plaintiff's federal claim, and we remand the case with instructions to dismiss without prejudice to plaintiff's ability to proceed with his state claim in state court.

*REVERSED AND REMANDED*

MICHAEL, Circuit Judge, dissenting in part and concurring in part:

I respectfully dissent from the majority's decision that Officer Johnathan Greene is entitled to qualified immunity. An objectively reasonable police officer would not use a find-and-bite dog to conduct a hasty and limited search for a missing thirteen-year-old boy who is highly intoxicated, harmless, and not wanted for a serious crime. The danger to the boy of using such a dog was well known long before this case:

> With the bite-and-hold technique, K-9 dogs are trained to bite and hold the suspect until commanded to release the suspect by the law enforcement K-9 officer. The suspect often struggles to avoid pain, injury, and arrest, prompting the dog to regrasp and hold with greater bite force. With this technique, the K-9 dog continues to bite and hold regardless of what the suspect does (surrenders, stands still, or attempts to flee). *Injury is almost inevitable*.

H. Range Hutson et al., *Law Enforcement K-9 Dog Bites: Injuries, Complications and Trends*, 29 Annals of Emergency

Med., 637, 638 (1997) (emphasis added). Oscar Melgar was seriously and permanently injured from the bite, re-bite, and grip of Officer Greene's dog. Melgar had a clearly established Fourth Amendment right to be free from this method of seizure brought about by Officer Greene.

I.

As many cases document, find-and-bite police dogs have caused serious injury, disfigurement, and even death. *See, e.g.*, *Trammell v. Thomason*, 335 Fed. Appx. 835, 836 (11th Cir. 2009) (victim underwent four operations and was hospitalized for eighteen days after police dog repeatedly bit his throat); *Crenshaw v. Lister*, 556 F.3d 1283, 1286 (11th Cir. 2009) (police dog bit victim 31 times) *Grimes v. Yoos*, 298 Fed. Appx. 916, 917 (11th Cir. 2008) (police dog bite caused victim to lose 30 percent of his arm); *Miller v. Clark County*, 340 F.3d 959, 961 (9th Cir. 2003) (police dog tore victim's skin in "four places above the elbow" and "shredded" the muscles underneath); *Vathekan v. Prince George's County*, 154 F.3d 173, 177 (4th Cir. 1998) (police dog bite put victim in hospital for six days and caused permanent facial disfigurement); *Kopf v. Wing*, 942 F.2d 265, 267 (4th Cir. 1991) (police dog "frightfully mauled" victim and caused "four scalp lacerations, a fractured skull, and a subdural hematoma"); *Robinette v. Barnes*, 854 F.2d 909, 911 (6th Cir. 1988) (police dog bite to victim's neck caused death); *Gibson v. City of Clarksville*, 860 F. Supp. 450, 453 (M.D. Tenn. 1993) (police dog bite required victim to undergo two surgeries and skin graft).

Find-and-bite police dogs tend to be larger breeds, weighing 70 to 90 pounds or more. P.C. Meade, "Police Dog and Domestic Dog Bite Injuries: What are the Differences?," 37 *Injury Extra* 395, 399 (2006), *available at* http://www. sciencedirect.com. These dogs are taught to inflict forceful bites using all of their teeth. *Id.* The force of a trained dog's bite is between 1,200 and 2,000 pounds per square inch.

*Vathekan*, 154 F.3d at 177 n.3 (citing Douglas U. Rosenthal, Note, *When K-9s Cause Chaos — An Examination of Police Dog Policies and Their Liabilities*, 11 N.Y.L. Sch. J. Hum. Rts. 279, 296 (1994)). This amount of force is comparable to an automobile wheel running over a body part. *Miller*, 340 F.3d at 962.

Here, a bite injury to Melgar was practically certain. The unmuzzled dog was on a long, fifteen-foot leash and was therefore not under reasonable control by Officer Greene. Indeed, once the dog bit and held the boy's leg, the officer was concerned about disengaging the dog before it bit the boy in the face with a disfiguring grip. As it was, the boy suffered deep lacerations above the ankle, which left permanent injury — a disruption of sensory nerves that causes particular discomfort during athletic activities, such as soccer.

## II.

For an official's conduct to violate clearly established law, a "prior case holding identical conduct to be unlawful is not required." *Vathekan*, 154 F.3d at 179. "In evaluating whether an officer is entitled to qualified immunity on an excessive force claim, the question is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Id.* (internal citations and quotations omitted). The reasonableness of a "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The focus is not on the officer's "underlying intent or motivation." *Connor*, 490 U.S. at 397. An "officer's good intentions" do not "make an objectively unreasonable use of force constitutional." *Id.*

The district court properly concluded that Melgar's rights were clearly established by our decision in *Kopf*, a case in which a find-and-bite police dog "frightfully mauled" a sus-

pect. 942 F.2d at 267. That decision does not, as the majority asserts, turn on the fact that the dog was released from its leash. Rather, there was a material factual dispute about the reasonableness of an officer's use of a find-and-bite dog to capture a suspected felon who fled from a vehicle, hid behind a shed, and may have been armed. *Id.* at 266. Key factual issues in dispute included whether the suspect was surrounded by the police before the dog attacked, whether the suspect physically resisted the police, and whether the police realized that the suspect was unarmed. *Id.* at 268. These factual issues were important to the determination of whether the dog was improperly deployed under the circumstances — circumstances laden with danger that was not present here. The police in *Kopf* were responding to a serious crime, an armed robbery, and the objective was to arrest the suspect. *Id.* at 266. Yet we held that even if "force was necessary to arrest [the suspect], a reasonable jury could find the degree of force excessive." *Id.* at 269.

The district court looked to *Kopf* as the relevant precedent rather than *Vathekan*, which focused on whether the officer issued a warning before releasing a find-and-bite dog. 154 F.3d at 180. *Vathekan*, however, was grounded on *Kopf* which we capsuled as follows: "In *Kopf* we held that the *improper deployment* of a police dog that mauls the target constitutes excessive force in violation of the Fourth Amendment." *Id.* at 179 (citing *Kopf*, 942 F.2d at 268) (emphasis added). "Deployment," of course, refers to the arrangement or use of a thing or force for a "deliberate purpose." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2007).

Officer Greene deployed his find-and-bite dog in part for the deliberate purpose of finding Melgar. As the majority recognizes, a seizure within the meaning of the Fourth Amendment occurred because the method used was "intentionally applied"; Melgar was seized "by the very instrumentality set in motion" to terminate his freedom of movement. *Brower v. County of Inyo*, 489 U.S. 593, 597, 599 (1989). By the same

token, Greene's deployment of the dog was a deliberate use of force because he knew that if the dog made physical contact with Melgar, it would bite and hold him.

The district court correctly denied Greene qualified immunity because the facts proffered by Melgar show that the deployment of a find-and-bite dog amounted to the use of excessive force. Despite Greene's futile hope that he could conduct a controlled, contact-free search for a teenager who he believed was in danger, his use of an unmuzzled find-and-bite dog on a long leash to execute this search was objectively unreasonable. First, Officer Greene was not attempting to find a fleeing adult who was suspected of committing a serious felony and might be armed. Although Melgar had illegally consumed alcohol, the search was "primarily for a missing person," not a criminal suspect, as the majority concedes. *Ante* at 12. Melgar was harmless, unarmed, intoxicated, and lost — not attempting to evade arrest.

Second, Officer Greene's use of the find-and-bite dog is not rendered reasonable by his subjective intent to "conduct a hasty search" and "not to spend a lot of time on [it]." J.A. 174, 176. Greene's description of a "hasty search" indicates that the situation did not call for the ultimate in aggressive measures — the use of a find-and-bite dog — notwithstanding the chilly temperature. He said that a key purpose of a "hasty search" is to gather information: "environmental information, information about the missing person, place last seen, et cetera." J.A. 175. He recognized that there were obvious risks in using a find-and-bite dog to conduct a hasty search: "If a dog locates a person and the dog has been tasked with locating a person, whether it be on a track, an open-building search, [or] an off-lead search, the dog will, *in the absence of a command*, seize the person usually by a limb and hold on." J.A. 180 (emphasis added). Greene's knowledge that his dog was trained to bite targets without command renders immaterial the majority's argument that the dog was not released from its leash. An unmuzzled find-and-bite dog searching in

the dark with the considerable freedom of movement afforded by a fifteen-foot lead was not under "substantial control," as the majority claims. *Ante* at 15.

Third, in light of what Officer Greene knew about Melgar and his companion, using a find-and-bite dog, with the attendant risk, was not warranted. Greene knew that Melgar's companion was found passed out on the ground, that Melgar was probably intoxicated to about the same degree, and that Melgar might also be found "laying out" somewhere. J.A. 174. In these circumstances, allowing an unmuzzled dog on a long leash to search for Melgar invited a serious bite injury that was practically inevitable.

Officer Greene's decision in this case was not in the "hazy border between excessive and acceptable force" so that a reasonable officer could not have known that he was violating the Fourth Amendment. *Saucier v. Katz*, 533 US. 194, 205 (2001). Greene's decision and conduct were out of bounds. However good his intentions (which are irrelevant to the clearly established right analysis), Greene made an objectively unreasonable miscalculation when he concluded that he could stop the dog before it bit and injured Melgar. The situation merited police attention and effort to be sure, but Melgar was not suspected of a serious crime and he was not evading arrest. Although Melgar was at some risk, the degree of risk did not justify the use of a dog trained for one task: finding, biting, and furiously holding on to the target.

### III.

I concur in the majority's determination that Officer Greene seized Melgar with the dog. Morever, I am somewhat encouraged by the majority's refusal to "say as a matter of law that no constitutional violation occurred," *ante* at 10, and its statement that "the obvious need is to strike a balance between locating a missing and possibly endangered individual and avoiding injury to that person when located," *id.* at 13. Still,

the majority holds that Officer Greene did not violate clearly established law. We should not inch toward clearly established law bite by disabling bite. Bolder action is called for today, and the basis for that action is the widely known danger that find-and-bite dogs present. It is already clearly established that the improper deployment of a find-and-bite dog that mauls its target constitutes excessive force in violation of the Fourth Amendment. *Kopf*, 942 F.2d at 268. A police officer's deliberate use of such a dog to search for a missing and harmless boy like Melgar violates this clearly established right.