**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JONATHAN TURMON,
　　　　　　　*Plaintiff-Appellee,*

v.

CHARLES JORDAN, Individually,
　　　　　　　*Defendant-Appellant,*

and

RED ROOF INNS, INCORPORATED,
　　　　　　　*Defendant.*

No. 04-1439

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Margaret B. Seymour, District Judge.
(CA-03-549-3-24)

Argued: December 2, 2004

Decided: April 25, 2005

Before WILKINS, Chief Judge, and MICHAEL
and TRAXLER, Circuit Judges.

---

Affirmed by published opinion. Judge Michael wrote the opinion, in
which Chief Judge Wilkins and Judge Traxler joined.

---

## COUNSEL

**ARGUED:** Andrew Frederick Lindemann, DAVIDSON, MORRI-
SON & LINDEMANN, P.A., Columbia, South Carolina, for Appel-

lant. John Christopher Mills, Columbia, South Carolina, for Appellee. **ON BRIEF:** William H. Davidson, II, Robert D. Garfield, DAVID-SON, MORRISON & LINDEMANN, P.A., Columbia, South Carolina, for Appellant.

---

## OPINION

MICHAEL, Circuit Judge:

The plaintiff alleges that a deputy sheriff violated his Fourth Amendment rights (1) by seizing him (for investigative purposes) without reasonable suspicion while he was a motel guest and (2) by using excessive force in the course of the seizure. The district court denied the deputy's motion for qualified immunity at the summary judgment stage, and the deputy filed this interlocutory appeal. We affirm.

I.

We recite the facts "in the light most favorable to the party asserting the injury," in this case the plaintiff, Jonathan Turmon. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002). Defendant Charles Jordan has been a deputy sheriff in Lexington County, South Carolina, since 1998. In 2001 he moonlighted, wearing his deputy's uniform, as a security guard at the Red Roof Inn on Berryhill Road (near I-26) in Columbia. According to Jordan, the motel was located in a high-crime area where there were robberies, drug dealing, and (suspected) prostitution.

On March 10, 2001, Turmon and his girlfriend, who were attending a concert in the Columbia area, rented a room at the Red Roof Inn. When they returned to the motel after the concert, their room was cold, and the heater was not working properly. Turmon called the front desk, and after the clerk dispatched someone to investigate, Turmon was told that the room would soon be heated. The room remained chilly, and in the early morning Turmon turned on the hot water in the shower in an effort to heat the room with steam. After a while the steam became stifling, and Turmon opened the door to allow it to escape.

At the same time, around 5:00 a.m., Deputy Jordan, who was working his guard job at the motel, and Hewey Dixon, the desk clerk, walked out to the parking lot (Dixon was about to move his car); they both suddenly noticed what appeared to be white smoke billowing from a room on the second floor. Believing there could be a fire, the two men started running toward the building. Before Dixon reached the building, he realized that what he had thought was smoke was dissipating rapidly and that it was just steam. In the meantime, Jordan was running up the outside stairs toward the room. Jordan was concerned that "fire ha[d] engulfed the room" and that someone might be "overwhelmed by the smoke." J.A. 67, 73. When Turmon heard someone's (Jordan's) footsteps, he shut the door and got back into bed.

At the moment Jordan heard the door close, his "whole mindset changed." J.A. 73. He believed the occupant had some improper motive for not wanting him (Jordan) to enter the room. Jordan concluded that the occupant was committing arson, attempting to hurt himself or someone else, or attempting to cover up some other illicit activity occurring inside the room. When Jordan reached the door, he did not smell smoke or see any sign of fire. Nevertheless, his assumption about wrongdoing prompted him to bang loudly on the door. Jordan did not identify himself as a police officer, prompting Turmon to ask, "Who is it?" J.A. 138. Jordan replied that it was the sheriff's department, and Turmon asked what he wanted. Jordan responded, "[Y]ou need to open the door now[!]" J.A. 137. Turmon then asked whether Jordan had a search warrant, and Jordan simply repeated his order that the door must be opened immediately. Turmon put on his pants and went to the door. When Turmon opened the door, Jordan pointed his gun at Turmon's face. Turmon raised his hands instantly and asked Jordan why his weapon was drawn; Jordan, without saying anything, grabbed Turmon and "jerked [him] outside" into the walkway. J.A. 99, 101, 189. Jordan then holstered his weapon, spun Turmon around, and proceeded to handcuff him. Turmon was entirely passive and did not resist the handcuffing. Jordan next retrieved and checked Turmon's identification. Turmon then told Jordan that he was a retired state trooper, and at that point Jordan removed the handcuffs and released Turmon.

Turmon sued Jordan and the motel asserting claims under 42 U.S.C. § 1983 and state law. Turmon invokes § 1983 to allege, among

other things, that Jordan violated his Fourth Amendment rights by (1) seizing him without reasonable suspicion (the illegal seizure claim) and (2) using excessive force in the course of the seizure (the excessive force claim). Jordan asserted the defense of qualified immunity in his answer. The district court concluded in pretrial proceedings that Jordan was not entitled to summary judgment on qualified immunity grounds. Jordan then filed this interlocutory appeal. "Our jurisdiction to review [an] order[ ] denying a summary judgment motion based on qualified immunity is limited . . . to the review of legal issues." *Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 229 (4th Cir. 2002) (citing *Johnson v. Jones*, 515 U.S. 304 (1995)).

II.

The doctrine of qualified immunity shields law enforcement officers performing discretionary duties "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because "[q]ualified immunity is an entitlement not to stand trial or face the other burdens of litigation," it is important to resolve the immunity question "at the earliest possible stage in litigation." *Saucier*, 533 U.S. at 200-01 (internal quotation marks and citations omitted). In an interlocutory appeal from the denial of qualified immunity, our analysis proceeds as follows. We begin by asking whether the facts, "[t]aken in the light most favorable to the [plaintiff]," show that "the officer's conduct violated a constitutional right." *Id.* at 201. If the answer is no, "that ends the matter, and the offic[er] is entitled to immunity." *Id.* at 200. "On the other hand, if a violation could be made out" on a view of the facts that is favorable to the plaintiff, "the next, sequential step is to ask whether the right was clearly established" at the time of the violation. *Id.* at 201.

A.

Deputy Jordan first contends that he is entitled to qualified immunity on Turmon's illegal seizure claim.

1.

We first consider whether the facts alleged, viewed in the light most favorable to Turmon, show that Jordan violated Turmon's

Fourth Amendment right to be free from unreasonable seizures. It is undisputed that Jordan seized Turmon when he pointed his gun at Turmon's face, pulled him into the walkway, and handcuffed him. It is likewise undisputed that the seizure was an investigative detention. The issue, then, is whether Jordan had "a reasonable suspicion supported by articulable facts that criminal activity 'may [have] be[en] afoot,'" thereby justifying a brief detention for investigative purposes. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

The facts in the summary judgment record do not provide grounds for a reasonable suspicion that criminal activity was afoot in Turmon's motel room. When Jordan saw what he thought was smoke coming from a room on the second floor, he believed there might be a fire. Thus, he ran up the stairs toward the room with the intention of aiding anyone who might need assistance in escaping. That much was reasonable. However, as Jordan was approaching the room, he heard the door close, and his "whole mindset changed." J.A. 73. In Jordan's mind, his mission changed from potential rescue to law enforcement. The shutting of the door led Jordan to conclude that the room's occupant did not want him "in there for an apparent reason," specifically, the occupant was "trying to hide what's going on." J.A. 73, 80. Jordan believed that the occupant was (1) "trying to burn down the building," (2) "trying to hurt" himself or "somebody in the room," or (3) "trying to cover something up" in this high-crime area. J.A. 81, 83, 86. By the time Jordan got to the door, he had determined that the room's occupant was "going to go into handcuffs" until he investigated the situation. J.A. 88.

To begin with, Jordan could not have had a *reasonable* belief that the room was on fire by the time he reached the door. There were no flames, there was no smell of smoke, and Jordan was aware that the motel's internal fire alarm had not sounded. If that was not enough to dispel any suspicion of arson, it was obvious that the room was not on fire as soon as Turmon opened the door. Nor did Turmon's shutting of the door moments before (as Jordan approached) support reasonable suspicion of criminal activity in the room. It can be expected that the occupant of a motel room — especially at a motel in a high-crime area — will shut his door when he hears unknown footsteps

approaching at 5:00 a.m. In sum, the facts reveal that Jordan did not have reasonable suspicion to detain Turmon.

2.

Having determined (on the summary judgment record) that Jordan violated Turmon's Fourth Amendment right to be free from unreasonable seizures, we turn to whether the right was clearly established at the time of the violation. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. In other words, the inquiry focuses on "whether the state of law at the time of the events at issue gave the officer fair warning that his alleged treatment of the plaintiff was unconstitutional." *Jones v. Buchanan*, 325 F.3d 520, 531 (4th Cir. 2003) (internal quotation marks and citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1986) (citation omitted). "Although earlier cases involving fundamentally similar or materially similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Buchanan*, 325 F.3d at 531 (internal quotation marks and citation omitted).

When Jordan seized Turmon on March 10, 2001, it was clearly established that a police officer must have "reasonable suspicion supported by articulable facts that criminal activity may be afoot" in order to justify an investigative detention. *Sokolow*, 490 U.S. at 7 (internal quotation marks and citation omitted). The general right to be free from unreasonable seizures is as old as the Fourth Amendment, and the specific requirement that a police officer have "some minimal level of objective justification" before seizing a person was established by at least 1968 when the Supreme Court decided *Terry v. Ohio. See id.* Moreover, we have found no basis for reasonable suspicion in circumstances that appeared to be less innocent than those in the present case. In *United States v. Burton*, 228 F.3d 524, 528-29 (4th Cir. 2000), for example, we held that officers could not pat down an individual, whom they had no reason to suspect was engaged in

criminal activity, simply because he was standing by a telephone booth, refused to answer their questions, and refused to remove his hands from his pockets when asked to do so. Likewise, Jordan had no reason to suspect Turmon of arson or other crimes, and there was nothing suspicious in the fact that Turmon closed his door when he heard someone approaching. Moreover, unlike the individual in *Burton*, Turmon complied fully with all of Jordan's commands and was not evasive in any way. *Burton* thus assists in making clear that in Turmon's case there was no ground for reasonable suspicion. Although we have found no case exactly like this one, we believe that the longstanding requirement of reasonable suspicion and cases such as *Burton* gave Jordan "fair warning that his alleged treatment of [Turmon] was unconstitutional." *Buchanan*, 325 F.3d at 531 (internal quotation marks and citation omitted). A reasonable police officer would have realized that there was no basis for reasonable suspicion of criminal activity and that seizing Turmon would be unlawful. Because Jordan violated Turmon's Fourth Amendment right to be free from unreasonable seizures and because that right was clearly established on March 10, 2001, Jordan is not entitled to qualified immunity on the illegal seizure claim.

B.

Deputy Jordan also contends that he is entitled to qualified immunity on Turmon's excessive force claim. Turmon claims that Jordan violated his Fourth Amendment rights by using excessive force during the seizure.

1.

We begin, of course, by considering whether the facts alleged establish the violation of a constitutional right. *Saucier*, 533 U.S. at 201. The Fourth Amendment's right to be free from unreasonable seizures includes the right to be free from seizures carried out with excessive force. *See Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2004). The facts, taken in the light most favorable to Turmon, show that Jordan pointed his gun at Turmon's face, jerked him from his room, spun him around, and then handcuffed him. To determine whether the force was excessive, we undertake the reasonableness inquiry described in *Graham v. Connor*, 490 U.S. 386 (1989). "As in

other Fourth Amendment contexts . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Id.* at 397.

In assessing whether an officer's actions were objectively reasonable, "we weigh 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Buchanan*, 325 F.3d at 527 (quoting *Graham*, 490 U.S. at 396). The nature of the intrusion on a plaintiff's Fourth Amendment rights is generally measured by "the amount of force employed to affect the seizure." *Howerton v. Fletcher*, 213 F.3d 171, 173 (4th Cir. 2000). "The extent of the plaintiff's injuries is also a relevant consideration." *Buchanan*, 325 F.3d at 527. Several factors are considered in assessing the governmental interests at stake, including the "severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officer[ ] or others, and whether he . . . actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Graham*, 490 U.S. at 396.

"[A]pproaching a suspect with [a] drawn weapon[ ] is an extraordinary measure," but this level of intrusion can be justified "as a reasonable means of neutralizing potential dangers to police and innocent bystanders." *United States v. Sinclair*, 983 F.2d 598, 602 (4th Cir. 1993); *see also Foote v. Dunagan*, 33 F.3d 445, 448-49 (4th Cir. 1994) (surveying Fourth Circuit case law on when it is permissible for a police officer to draw his weapon on a suspect). Here, the level of intrusion was not limited to the drawing of a weapon. Not only did Jordan point his gun at Turmon's face, but he also wrenched Turmon from his room, spun him around, and handcuffed him. Jordan twisted Turmon's back and aggravated a prior injury in the process. As a result, Turmon underwent six months of rehabilitation. (It is not clear from the current record whether the force used by Jordan would have injured Turmon notwithstanding his previous back injury, but Turmon has at least raised an issue of fact as to whether the extent of his injuries are indicative of excessive force.)

When we weigh the level of force used by Jordan against the governmental interests at stake, it becomes clear that his actions were not

"'objectively reasonable' in light of the facts and circumstances confronting" him. *Graham*, 490 U.S. at 397. The *Graham* factors for measuring the governmental interests at stake are absent here. First, "the severity of the crime" cannot be taken into account because there was no crime. *Id.* at 396. Of course, Jordan claims that he reasonably believed that arson or some other crime was being committed, but the facts do not support a reasonable suspicion that criminal activity was afoot. *See supra* at 5-6. This weighs heavily in Turmon's favor. *See Bailey v. Kennedy*, 349 F.3d 731, 744 (4th Cir. 2003). Second, there is no evidence that Turmon "pose[d] an immediate threat to the safety of [Deputy Jordan] or others." *Graham*, 490 U.S. at 396. Third, Turmon did not "actively resist[ detention] or attempt to evade [detention] by flight." *Id.* To the contrary, all of the relevant evidence indicates that Turmon was compliant and non-threatening. When Turmon opened the door, and Jordan pointed the gun at his face, Turmon raised his hands and offered no resistance. Even Jordan acknowledges that Turmon was completely passive and caused no trouble as he was being handled and handcuffed. Accordingly, we conclude that "the facts alleged show [that Jordan's] conduct violated a constitutional right," namely the Fourth Amendment right to be free from a seizure carried out by the use of excessive force. *Saucier*, 533 U.S. at 201.

2.

We next examine whether Turmon's Fourth Amendment right to be free from excessive force was clearly established at the time of the violation. Again, the relevant inquiry "in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. We conclude that on March 10, 2001, it would have been clear to a reasonable officer that he could not point his gun at an individual's face, jerk him from his room, and handcuff him when there was no reasonable suspicion that any crime had been committed, no indication that the individual posed a threat to the officer, and no indication that the individual was attempting to resist or evade detention. The contours of the Fourth Amendment right to be free from excessive force during a seizure were set forth sixteen years ago by the Supreme Court in *Graham*. 490 U.S. at 396-97. In addition, over the years this court has addressed the propriety of the use of force comparable to that used by Deputy Jordan, and we have consistently found

such force to be proper only in situations in which there was at least reasonable suspicion to believe criminal activity was afoot. *See Dunagan*, 33 F.3d at 448-49. Because the facts alleged show that Jordan violated Turmon's Fourth Amendment right to be free from seizures carried out by excessive force and because that right was clearly established at the time, Jordan is not entitled to qualified immunity on the excessive force claim.

### III.

We affirm the district court's order denying Deputy Charles Jordan qualified immunity with respect to Jonathan Turmon's illegal seizure and excessive force claims.

*AFFIRMED*