Affirmed by unpublished opinion. Judge Thacker wrote the majority opinion. Judge Traxler wrote a separate concurring opinion. Judge Harris wrote a dissenting opinion.
Unpublished opinions are not binding precedent in this circuit.
THACKER, Circuit Judge:
Late on the night of May 4, 2010, Officer Terence Garrison (“Appellee”) and his police dog, Bikkel, tracked a robbery suspect to an apparently abandoned house in High Point, North Carolina. At the front stoop, Bikkel sprang into action, biting an individual crouched behind a nearby bush. Unfortunately, it was not the suspect,' but instead Christopher Maney (“Appellant”). In the ten or so seconds that followed, Appellee realized Appellant did not match the physical description of the suspect he and Bikkel were tracking. But he nevertheless feared Appellant might pose a threat to the officers, and so ordered Appellant to show his hands before calling off the dog. During that time, Bikkel continued to bite and hold Appellant for a few seconds.
The district court concluded that Appel-lee was entitled to qualified immunity from Appellant’s excessive force claim, and that a similar form of state-law immunity insulated him from Appellant’s battery claim. In reviewing that decision, we must decide whether a police canine handler, whose dog suddenly and mistakenly bites a concealed bystander while tracking the scent of a robbery suspect, clearly violates the Fourth Amendment if he momentarily extends the seizure to assess the potential threat to officer safety. Like the district court, we think the law as it stood on the night in question did not clearly proscribe such conduct. We therefore agree that Ap-pellee is entitled to immunity and affirm.
I.
We recite the facts in the light most favorable to Appellant. See Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 2017, 188 L.Ed.2d 1056 (2014). Around 10:00 p.m. on the night of May 4, 2010, someone robbed the Sonic restaurant on South Main Street in High Point, North *213 Carolina. Witnesses described the perpetrator as “a clean shaven black male[,] approximately thirty to forty years of age,” who had a “bald head,” stood “approximately five foot ten inches,” and had a “medium build[.]” J.A. 164.[1] He did not use a weapon and fled the scene on foot.
About a mile west of the Sonic, Appellant was bedding down for the night in a temporary camp where “homeless people and persons who are temporarily displaced often set 0 up tents and other structures .... ” J.A. 228. Unlike the suspect in the robbery, Appellant is white, not bald, and stands approximately five-feet five-inches tall. And, unlike the suspect, Appellant had committed no crime that night.
Appellee and his police dog, Bikkel, were on patrol in the area and joined in the robbery investigation. Bikkel is a Belgian Malinois trained to track and apprehend suspects using the bite and hold technique. That means Bikkel will bite and hold in three circumstances: (1) upon command; (2) if he encounters the suspect he is tracking; or (3) if he or Appellee is under attack.
Appellee spoke with a witness who pointed out the area where the suspect had last been seen running. Appellee then “put Bikkel on that scent, a suspect scent,” J.A. 269, and followed behind on a 15-foot lead. The duo plus one additional officer, Riley Edwards, tracked the scent to the homeless camp. Appellee “lit up the area” with his flashlight and gave two verbal warnings that a police canine was in the area. Id. at 276. He received no response and saw no movement in the camp.
By that time, Appellant was no longer at the camp because he had been warned by another camp inhabitant that “a group of people w[as] approaching quickly from the railroad tracks on the North side of the camp.” J.A. 229. Appellant “had no idea who was coming and was scared,” because he “knew at the time that other people in the camp had enemies who ... could be violent,” Id. So he fled south on foot and “crouched in the edge of the bushes” adjacent “to the stairs leading up to the front porch” of a nearby residence. Id. The bushes were “devoid of foliage and leaves” and the area was illuminated by two street lights. Id.
Across the street from the house where Appellant was hiding, Bikkel began “air scenting,” which suggested to Appellee that the robbery suspect was nearby. J.A. 288. Bikkel then tracked toward the house and Appellant’s position.
During this portion of the tracking, Ap-pellee was trying to be quiet. Appellant could clearly see the officers approaching, but they “did not announce themselvesf.]” J.A. 229. Bikkel “climbed the front steps ... onto the porch,” passing within just a few feet of Appellant’s position. Id. at 230. Appellee followed closely behind with his gun drawn and shortened the lead on the dog to three feet. This gave him more control over the dog’s movements. He also scanned the area near the stairs with his gun light, but did not specifically look at the area where Appellant was hiding.
At the top of the stairs, Bikkel air scented again, indicating that the suspect was likely “pretty close.” J.A. 296. Appellee’s attention was drawn in particular to the door to a crawlspace at the front of the house, which was open. Based on Bikkel’s air scenting, he believed the robbery suspect was likely concealed there, under the house. Appellee did not, however, announce himself or warn of Bikkel’s presence. For his part, Appellant “was concerned the dog or officers would attack [him] if [he] startled them,” so he kept *214 quiet and remained still, crouched in his position beside the stairs. Id. at 230.
The unfortunate events that followed unfolded in roughly ten seconds. Appellant maintains he was “visible to the officers where [he] was crouching”[2] when, “[suddenly, without warning or provocation,” Bikkel “lunged out” from the top step of the porch and “bit [Appellant] on the top of [his] head[.]” J.A. 230. Appellee did not command Bikkel to bite Appellant and there is no evidence Appellee knew Bikkel was going to lunge into the bushes. Bikk-el’s lunge in the direction of the bushes was also unexpected because the duo had already tracked past that position on their way up the steps to the porch: as Appellee explained, if Bikkel sensed the suspect in the bushes, he should have gone “straight to there[; n]ever up on the porch.” Id. at 310. But given the indications that Bikkel was tracking the suspect’s scent, once Bikkel sprang into action Appellee thought the “suspect was in the bushes, and Bikkel had just screwed up” by passing that position initially. Id.
“Following the initial bite, [Appellee] saw [Appellant] and could see [his] features and skin color.”[3] J.A, 230. But “despite being able to see that [Appellant] was not the suspect in the robbery,” Appellee “made no attempt to command the dog to stop his attack.” Id. As Appellee explained, he found it unusual and threatening that Appellant was hiding in the bushes in the darkness and had not identified himself. And, based on Bikkel’s air scenting, he also believed the suspect was potentially still near at hand, leaving the officers vulnerable to an ambush. In the tense seconds that followed, Appellee, in an attempt to make'sure the person hiding in the bushes was not a threat, repeatedly ordered Appellant to show his hands, while Appellant “attempted to protect [him]self from the dog and pleaded for the police to stop the dog’s attack, stating that [he] had done nothing wrong.” Id. at 231.
Ultimately, Bikkel bit Appellant on the left arm and once more on the left thigh before Appellee “finally told the dog to cease his attack.” J.A. 231. The bites left a “two square inch” laceration on Appellant’s head and “deep-puncture wounds” to his arm and thigh “which led to profuse bleeding[.]” Id. at 230-31. When the dust settled, “officers including [Appellee]” placed Appellant in handcuffs, id. at 232, called for emergency medical services in order to give medical attention to Appellant, and discontinued their search of the premises, even though Appellee believed the suspect was in fact under the house or concealed nearby.
In the aftermath, Appellant sued, alleging a violation of his Fourth Amendment right to be free from unreasonable seizure as well as a state-law claim for battery. The district court granted Appellee’s motion for summary judgment, holding that although Appellee’s use of force may have been unreasonable as a matter of law, an *215 officer in Appellee’s position would not have known “that his conduct violated a clearly established right.” J.A. 382-84. The district court also concluded that Appellee was immune from the battery claim because Appellant “failed to provide evidence that [Appellee] was acting with a malicious intent to injure [Appellant].” Id. at 387-88. This timely appeal followed.
II.
Our first task is to consider de novo the district court’s decision to grant Appellee qualified immunity from Appellant’s Fourth Amendment claim. See Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015).
A.
We begin by acknowledging that Appellant was guilty at worst of being in the wrong place at the wrong time and failing to reveal himself to the police. His seizure accomplished nothing (if anything it impeded the robbery investigation) and it took a painful toll.
But qualified immunity protects government officials from liability, even in cases with plainly bad outcomes, if “their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The doctrine balances “the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.” Id. “When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law.” Ashcroft v. al-Kidd, 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (internal quotation marks omitted).
Our task, then, is not to ask whether Appellant’s injuries are regrettable, as surely they are, but instead whether the facts taken in his favor show (1) that Ap-pellee violated a constitutional right, and (2) that the right was clearly established at the time of the events in question. See al-Kidd, 563 U.S. at 735, 131 S.Ct. 2074. We have discretion to decide which of those questions to address first “in light of the circumstances in the particular case at hand.” Pearson, 555 U.S. at 236, 129 S.Ct. 808. In many cases it is beneficial to determine first whether the facts establish a violation of the Constitution. See, e.g., Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 899-900 (4th Cir. 2016), But in some cases, and this is one, the “constitutional question is so factbound that” deciding it would provide “little guidance for future cases.” Pearson, 555 U.S. at 237, 129 S.Ct. 808.
We therefore proceed to the second question, keeping in mind that “a defendant cannot be said to have violated a clearly established right unless the right’s contours were sufficiently definite that any reasonable official in the defendant’s shoes would have understood that he was violating it.” Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014). In other words, while a case directly on point is not required, “existing precedent must have placed the ... constitutional question beyond debate.” al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074. “The dis-positive question is whether the violative nature of particular conduct is clearly established.” Mullenix v. Luna, — U.S. -, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (emphasis in original) (internal quotation marks omitted).
B.
Appellant argues any reasonable officer would have known the force used in this case was excessive for three reasons.
*216 1.
First, Appellant maintains that our decisions in Kopf v. Wing, 942 F.2d 265 (4th Cir. 1991), and Vathekan v. Prince George’s County, 154 F.3d 173 (4th Cir. 1998), clearly establish that it is unreasonable to use a police dog without first giving a verbal warning. In Kopf, we reversed a defense summary judgment where officers tracked suspects in an armed robbery to a narrow alley, and released a dog into the enclosure (allegedly) without warning. In doing so, we noted that the parties’ factual dispute over the issuance of a warning was “crucial, because a forewarning that the dog is going to attack, which provides the suspects a fair chance to surrender, is more reasonable than a surprise assault.” 942 F.2d at 268. Similarly, in Vathekan, we. reversed an award of summary judgment based on qualified immunity where an officer released his dog into a house where a suspected burglar may have been hiding (again, allegedly) without warning, resulting in severe injuries to the home’s owner. As we explained, qualified immunity was not warranted because “it was clearly established [tjy Kopf] that failing to give a verbal warning before deploying a police dog to seize someone is objectively unreasonable and a violation of the Fourth Amendment.” 154 F.3d at 179.
Yet despite the apparent clarity of those holdings, our subsequent decision in Melgar ex rel. Melgar v. Greene, 593 F.3d 348 (4th Cir. 2010), cast serious doubt on the breadth of the warning requirement set forth in Kopf and Vathekan. In Melgar, an officer used a police dog trained in the bite and hold technique to search for a missing teenager in distress. Although the officer kept the dog leashed at all times, the canine nevertheless found the boy, bounded into the bush beneath which he was hiding, and bit him on the ankle causing serious injury. Like Appellant, the Melgar plaintiff asserted the officer’s use of the dog violated the clear warning requirement set down in our prior cases. We acknowledged that “Vathekan and Kopf ,.. established] that a warning is necessary before releasing a dog,” but identified a “vast difference between an officer releasing a dog off a leash ... and an officer exercising substantial control over a leashed animal.” 593 F,3d at 358. As a result, we granted the officer qualified immunity on the theory that “[c]ases addressing the former simply do not provide sufficient guidance to officers in the latter situation.” Id.
We have serious doubts about the propriety of that distinction. As this case shows (and, indeed, Melgar itself showed), a leashed dog may be easier to control to some extent, but can nevertheless do serious damage if it tracks, locates, and ultimately bites and holds a suspect. See also Kuha v. City of Minnetonka, 365 F.3d 590, 595-96 (8th Cir. 2003) (leashed dog “bounded into the three-foot-high grass and ‘seized’ ” suspect), abrogated on other grounds by Szabla v. City of Brooklyn Park, 486 F.3d 385 (8th Cir. 2007) (en banc). But whatever our reservations, there is no denying that Melgar muddied the question of whether officers must issue warnings when utilizing police dogs on leash, as Appellee did here. Indeed, the rule Appellant maintains was clearly established—that an officer must warn before using a canine, whether on leash or off— was forcefully articulated in the Melgar dissent, rather than the majority opinion. See Melgar, 593 F.3d at 363 (Michael, J., dissenting) (arguing that officer “deployed” his canine despite keeping it leashed where the dog was used in part for the deliberate purpose of finding a lost teenager). As a result, we cannot say that any reasonable officer would have known he was required to warn of Bikkel’s pres *217 ence as he approached Appellant’s position.
2.
Appellant next argues Kopf clearly established that it is unreasonable to prolong a dog bite seizure until a subject complies with orders to surrender. In that case, two suspects fled the scene of an armed robbery and hid in an “extremely narrow” enclosure between a shed and an adjoining fence. Kopf, 942 F.2d at 266. Police had reason to believe the suspects might be armed, so a canine handler released a police dog into the passageway, where he first bit the female and then the male suspect. The canine officer called on the suspects to show their hands, but they did not. Two additional officers then entered the corridor and began struggling ■with the male suspect. The canine handler at that point recognized that the male suspect was unarmed but still did not command the dog to release his hold. Instead, he joined his fellow officers in the enclosure, where all three struck the suspect several times with blackjacks and flashlights.
By the time it was all over, the suspect had been “nearly beaten to death.” Kopf, 942 F.2d at 269. He was “frightfully mauled,” and arrived at the hospital in “critical condition” with a fractured skull, subdural hematoma, and “lacerations of the upper lip, chest, knee, leg, and scrotum.” Id. at 267. Under those circumstances, we expressed our belief “that a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites his scrotum,” Id. at 268. But we ultimately held that qualified immunity was inappropriate because the undisputed facts did not “portray an extraordinary situation” justifying the “severe” and “extraordinary force” allegedly used by the officers. Id. at 269.
Here, the district court reasoned that Kopf did not put the constitutional question about Appellee’s conduct in this case beyond debate because in Kopf we “only found that a jury may conclude that forcing a person to show his hands prior to calling off the police K-9 is excessive force,” but did not state “definitively that such conduct did in fact amount to a constitutional violation.” J.A. 383. The district court’s view is not unfounded. Once a court has “viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer’s actions were reasonable is a question of pure law.” Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc); see also Scott v. Harris, 550 U.S. 372, 381 n.8, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Our suggestion that a jury “could” find the officers’ conduct in Kopf objectively unreasonable might, therefore, be read as equivocation on a mixed question of law and fact rather than a definitive statement that certain conduct violates the Fourth Amendment.
But we need not rest our holding on the ambiguity in Kopfs language. Like the district court, we think the facts of Kopf are too dissimilar from this case to provide adequate guidance to an officer in Appel-lee’s position. The officers in Kopf were dealing with an armed robbery suspect, albeit one who they knew was unarmed, outnumbered, and effectively cornered by the time they asked him to surrender. And although the suspect was fighting with the dog, he was also being subdued by three officers who were hitting him with flashlights and blackjacks while the police dog continued to bite him on the scrotum, among other areas. In other words, the officers were confronted with a clearly unarmed suspect who was going nowhere; they outnumbered him and were beating *218 him into submission; and yet they chose to allow the dog to continue biting the suspect in the most sensitive of areas.
By contrast, here, Appellee suddenly and unexpectedly found himself in relatively close quarters with an unknown and concealed individual who had been hiding in the area where Appellee expected to find the perpetrator of a recently committed robbeiy and assault. Although Appel-lee quickly realized Appellant was not the suspect, he could also reasonably have believed, based on Bikkel’s air scenting, that the potentially dangerous criminal suspect was in fact still nearby. And it is undisputed that he quickly called Bikkel off within just a few seconds after calling for Appellant to show his hands. Unlike Kopf, there is no indication that Appellee gratuitously prolonged the biting after determining that Appellant was unarmed and surrendering. Cf. Cooper v. Brown, 844 F.3d 517, 521, 523 (5th Cir. 2016) (affirming denial of qualified immunity where police dog “continued biting [the nonresistant suspect] for one to two minutes”; officer did not command the dog to release his bite until suspect had rolled onto his stomach and was in handcuffs; and officer had “no reason to believe that [the suspect] posed a threat”); Becker v. Elfreich, 821 F.3d 920, 929 & n.2 (7th Cir. 2016) (holding that allowing a police dog to continue biting while the officer pulled a nonresistant suspect down the stairs and knelt on his back clearly violated the Fourth Amendment, but specifically noting the case did “not involve a split-second delay between the officer pulling [the suspect] to the ground and directing [the dog] to” stop biting).
Under those circumstances we think an objective officer familiar with Kopf could reasonably, even if mistakenly, have believed that he was not required to call Bikkel off for the eight or so seconds that it took to surmise that Appellant posed no immediate threat to officer safety. See Kuha, 365 F.3d at 600-01 (holding it was not unreasonable for officers to extend a dog bite seizure for ten to fifteen seconds while searching the area around an unarmed suspect who nevertheless inexplicably fled from a minor traffic stop). In the end, whatever Kopf may say about the likelihood that a suspect will calmly surrender while being bitten by a dog, the case is simply too factually dissimilar to place the situation facing Appellee beyond constitutional debate. Accordingly, we agree with the district court that Appel-lee’s decision to briefly prolong Bikkel’s seizure of Appellant did not violate a constitutional right that was clearly established by Kopf
3.
Appellant’s final argument, quite apart from Kopf and Vathekan, is that every reasonable officer would have known that the use of any force was unreasonable here because there was no basis for seizing Appellant in the first instance.
This argument requires us first to determine when the seizure began. “The Supreme Court has explained that a Fourth Amendment seizure requires ‘an intentional acquisition of physical control’ which occurs ‘only when there is a governmental termination of freedom of movement through means intentionally applied’ ” Melgar, 593 F.3d at 354 (quoting Brower v. Cty. of Inyo, 489 U.S. 593, 596, 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)). To be sure, a seizure may occur “even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful,” rather than the product of “an unknowing act.” Brower, 489 U.S. at 596, 109 S.Ct. 1378. In other words, “one is ‘seized’ within the [F]ourth [A]mendment’s meaning only when one is the intended object of a physi *219 cal restraint by an agent of the state.” Rucker v. Harford Cty., 946 F.2d 278, 281 (4th Cir. 1991).
Here, several facts suggest Appel-lee did not initially intend to seize Appellant. First, Appellee not only kept Bikkel on a leash as he approached the area where Appellant was hiding, but also shortened the leash, presumably to exert greater control over the dog’s movements. Second, Appellee did not know anyone was hiding in the bushes (instead believing the robbery suspect was hiding under the house), and he did not expect Bikkel to lunge towards the bushes, because the dog had already tracked past that location without alerting or springing into action. Finally, it is undisputed that Appellee did not command Bikkel’s first bite; instead, as even Appellant suggests in his affidavit testimony, the dog “[sjuddenly, without warning or provocation ... lunged out” from the top step of the porch. J.A. 230. All of this suggests that, so far as Appellee was concerned, the first bite was spontaneous and unexpected. And as a result, we think Appellant did not become the intended object of a seizure for Fourth Amendment purposes until Appellee realized what had happened but nevertheless declined to call off the attack. Cf. Dunigan v. Noble, 390 F.3d 486, 492-93 (6th Cir. 2004) (no seizure where officer did not command dog to bite and dog reacted instead to a bystander entering the “dog’s defensive perimeter”). The question, then, is whether every reasonable officer would have known the second and third bites were clearly unreasonable.
A brief detention for investigative purposes is reasonable if an officer “observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.” Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); see also Turmon v. Jordan, 405 F.3d 202, 205 (4th Cir. 2005). “Considering the totality of the circumstances, we are to determine whether there was a sufficient objective, particularized basis for suspecting the person seized of criminal activity.” United States v. Massenburg, 654 F.3d 480, 485 (4th Cir. 2011). “Evidence that would support only a mere hunch is insufficient, though a reasonable basis need not establish probable cause and may well fall[ ] considerably short of satisfying a preponderance of the evidence standard.” Id. (internal quotation marks omitted). “[Rjelevant to the totality of the circumstances are various individual factors traditionally relied upon by police officers, such as whether the stop occurred in a high-crime area, or whether the suspect engaged in evasive behavior or acted nervously.” United States v. Mayo, 361 F.3d 802, 805-06 (4th Cir. 2004) (internal citation omitted).
The fact that an individual happens to be near to where police suspect criminal activity is taking place, standing alone, does not provide reasonable suspicion to stop just anyone in the area. See Mayo, 361 F.3d at 807. But that is not what happened here. Instead, Appellant was crouching in the dark behind a bush in the immediate location where, based on Bikkel’s tracking, Appellee expected to find the suspect in a recently-committed robbery and assault. And while it is true that Appellee quickly realized Appellant was not the suspect, we can hardly say there was nothing suspicious about the situation or Appellant’s behavior.
Indeed, given that Bikkel confused Appellant’s scent for the suspect’s, we think a reasonable officer could have believed the two were hiding together or had recently *220 been in close contact.[4] And although there were no reports of the robbery suspect acting with an accomplice, Appellant was also actively hiding from the police as they approached, behavior which we have previously found can contribute to an officer’s reasonable suspicion.[5] See, e.g,, United States v. Sims, 296 F.3d 284, 286-87 (4th Cir. 2002) (upholding Terry stop where an individual was found crouching and hiding around a corner “a very short distance from the spot where a shot was reportedly fired”). Given the totality of those circumstances, we cannot say it would have appeared beyond debate to any reasonable officer that there was no reasonable suspicion to conduct an investigative stop. For example, we think Appellee could have reasonably, if mistakenly, suspected Appellant was hiding with and helping to conceal the robbery suspect and thus an accessory after the fact. See N.C. Gen. Stat. § 14-7.
And we do not think it would have been patently obvious to any officer that briefly using a police dog in the situation presented here would necessarily violate the Fourth Amendment. It is true that Terry stops can, and generally should, be minimally intrusive. See Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion). But “the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion ... to effect it.” Graham, 490 U.S. at 396, 109 S.Ct. 1865 (emphasis supplied). Officers conducting Terry stops may, therefore, “use such reasonable force as may be necessary to” effectuate the stop, United States v. Haye, 825 F.2d 32, 35 (4th Cir. 1987), “to maintain the status quo[,] and to protect their safety,” United States v. Sinclair, 983 F.2d 598, 602 (4th Cir. 1993) (holding that officer’s decision to draw his weapon during a Terry stop was not improper even though the officer “had no reason to believe [the suspects] were armed and dangerous”); see also, e.g., Young v. Prince George’s Cty., 355 F.3d 751, 755 (4th Cir. 2004) (citing prior cases upholding the use of handcuffs and drawing of weapons during Terry stops).
To be sure, a bite from a police canine is a significant use of force. See Melgar, 593 F.3d at 362 (Michael, J., dissenting). And we have long held the use of other significant forms of force, whether “from a gun, a baton, a taser, or other weapon, precludes an officer from receiving qualified immunity if the subject is unarmed and secured.” Meyers v. Baltimore Cty., 713 F.3d 723, 734-35 (4th Cir. 2013) (discussing prior precedent). Unsurprisingly, then, courts have denied qualified immunity to officers who use dogs on suspects who *221 have genuinely surrendered, see Becker, 821 F.3d at 929, or immediately complied with police orders to do so, see Alicea v. Thomas, 815 F.3d 283, 290 (7th Cir. 2016).
Had Appellee encountered Appellant in broad daylight with time enough to call on him to surrender, or had Appellant announced his presence to the approaching officers and emerged from his hiding place with hands raised, this case would present an entirely different question. Instead, Ap-pellee had every indication that the suspect in an assault and robbery was concealed somewhere in the darkness nearby, when Bikkel, who was tracking the suspect’s scent, suddenly sprang into action. In the seconds that followed, Appellee determined Bikkel had not seized the suspect. But the resolution of that uncertainty understandably gave rise to more questions: Who was this person crouching behind a bush, in the dark, near an abandoned house? Why did he continue hiding as police approached? Why did Bikkel confuse him for the suspect? Was he acting in concert with the suspect? Was the suspect still in fact nearby? And, in about as much time as it takes to type (let alone to answer) those questions, Appellee sought to resolve perhaps the most pressing uncertainty of all—whether the unknown individual hiding from police, in the spot where Bikkel had tracked the robbery suspect, was a threat to officer safety. As soon as Appellee determined the answer to that question was “no,” it is undisputed that he called Bikkel off and restrained the animal.
In sum, Appellee was faced with a situation that was tense, uncertain, and rapidly evolving—precisely the context in which the Supreme Court has counseled us to make allowances for on-the-scene decisions about the amount of force that is necessary, “even if it may later seem unnecessary in the peace of a judge’s chambers!)]” Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation marks omitted). Once he ascertained that Appellant posed no threat and was not resistant, Appellee discontinued the use of force, even though a reasonable officer could have considered Appellant’s connection to the robbery suspect and reasons for hiding from the police as yet open questions. Under those circumstances, we cannot say that every reasonable officer would have known his conduct was, beyond question, a violation of the Fourth Amendment.[6]
C.
Judge Harris laments the severity of the force employed in this case, and understandably so. One need not look far beyond each morning’s newspaper to find alarming examples of police officers using force in ways that should give us—as citizens and as judges—cause for concern. This case is no exception. That is why I would not hold, much less suggest, that Appellee’s deployment of Bikkel complied with the Fourth Amendment.[7]
*222 But current events remind us, too, that threats to officer safety are not imaginary, and that police are often asked to intervene at a moment’s notice- in tense, difficult situations, on the basis of imperfect information and with little time for deliberation. That is why we do not engage in “unrealistic second-guessing” of action taken in swiftly developing situations, United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), and why we do not subject officers to personal liability for “bad guesses in gray areas,” Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).
Our task instead is to assess whether Appellee ran afoul of bright constitutional boundaries. In the dissent’s view, the common sense answer is clearly “yes.” I agree that common sense should guide our decision making. And when three judges consider the same set of facts and in good faith take three different views of the law, common sense tells me that things may not be as clear to every cop on the beat as the dissent would suggest.
For example, a reader of the dissent’s cogent discussion of Terry’s stop and frisk procedure could be forgiven for believing it well-settled that “a limited pat-down of a suspect’s outer clothing ... is all” the physical contact an officer may ever make with a suspect on the basis of reasonable suspicion. Post at 41. That is certainly all that should happen in the ordinary case. But as the dissent acknowledges, a “standard Terry stop ... is not what happened here.” Id. at 40. And an officer executing a seizure on the basis of reasonable suspicion under considerably more exigent circumstances would be surprised to learn that a frisk is all the physical contact permitted. In fact, when the classic Terry tableau is replaced by something more dynamic, we and others have sanctioned stops involving far more force. See United States v. Haye, 825 F.2d 32, 33-35 (4th Cir. 1987) (officer acting on reasonable suspicion chased, tackled, and forcefully handcuffed a suspect); United States v. Dykes, 406 F.3d 717, 720 & n.2 (D.C. Cir. 2005) (same and collecting cases from other circuits); see also United States v. Lawshea, 461 F,3d 857, 860 (7th Cir. 2006) (using a police canine to stop and bite a fleeing suspect did not convert Terry stop into custodial arrest requiring probable cause). True, those cases mostly involve fleeing suspects, which Appellant was not. But discovered so suddenly and unexpectedly as he was—in circumstances a reasonable officer could have mistaken for lying in wait—the situation was unusual enough that this case cannot be resolved by simply pointing out the differences between an ordinary Terry stop and what happened here.
As one of our sister circuits explained over two decades ago, we have seen an “expansion of Terry, including the trend granting officers greater latitude in using force in order to neutralize potentially dangerous suspects during an investigatory *223 detention.” United States v. Tilmon, 19 F.3d 1221, 1224 (7th Cir. 1994) (internal quotation marks omitted). “For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention.” Id. at 1224-25. That trend may well be for the worse. But it unquestionably blurs the lines about the degree of force that Terry permits. That “latitude ... to neutralize potentially dangerous suspects” may not stretch far enough to cover what happened here (a question which, again, I do not resolve). But under the tumultuous, spontaneous, and unexpected circumstances of this case, I do not think the answer is as obvious as my dissenting colleague sees it, and that is what matters for purposes of qualified immunity analysis.
None of that, however, should be taken as minimizing the impact of these events on Appellant, who did not deserve the misfortune that befell him. Nor do I mean to imply that officer safety is more important than citizen safety. Both are important interests; when in tension they must be carefully balanced. Our conclusion that Appellee is entitled to qualified immunity simply reflects one way in which we strike that balance: by affording officers “breathing room to make reasonable” even if “mistaken judgments about open legal questions.” al-Kidd, 563 U.S. at 743, 131 S.Ct. 2074. Like the district court, I cannot say Appellee acted perfectly under the circumstances. But by the same token I cannot say his actions rose to the level of plain incompetence or knowing violations of the law. And so, like the district court, I conclude that Appellee is entitled to qualified immunity.
III.
Finally, we briefly consider whether the district court properly granted Ap-pellee state-law immunity from Appellant’s battery claim.
“Under North Carolina law, public officials engaged in discretionary, governmental duties enjoy absolute immunity from personal liability so long as they keep within the scope of their official authority and act without malice or corruption.” Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003) (citing Grad v. Kaasa, 312 N.C. 310, 321 S.E.2d 888, 890 (1984)). “[A]n officer acts with malice when he' ‘does that which a man of reasonable intelligence would know to be contrary to his duty.’” Id. (quoting Grad, 321 S.E.2d at 890).
Appellant argues that Appellee’s conduct was “malicious in that it was in reckless disregard to [his] rights and safety.” Appellant’s Br. 21. But having determined that Appellee transgressed no clearly established constitutional boundaries, that theory of maliciousness fails. See Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013) (explaining that state law “man of reasonable intelligence standard” is “functionally identical” to federal “clearly established” standard). And Appellant’s remaining theory, that Appellee actually wantonly intended to injure him, is, as the district court held, unsupported by even Appellant’s version of the facts. Accordingly, we agree with the district court’s conclusion that Appellee is immune from Appellant’s battery claim.
IV.
For the foregoing reasons, the judgment of the district court is

AFFIRMED.

. Citations to the ''J.A.” refer to the Joint Appendix filed by the parties in this appeal.

. The district court, reasoning Appellant could do little more than speculate about whether he was visible to the officers, did not consider this portion of Appellant's affidavit. But we think it is reasonable to infer that Appellant was visible because the bush he was crouching behind was bare, the area was illuminated by streetlights, and Appellee scanned the area next to the stairs with his gun light as he approached. While Appellant may have been visible, obviously neither Bikkel nor the officer saw him, as neither reacted to his presence when they passed by him, and after they went by him, Appellant remained crouched behind the bush,

. The district court also declined to consider this statement from Appellant’s affidavit. But Appellee’s own testimony confirms that he realized during the fracas that Appellant was white and "did not match the physical description of the [robbery] suspect.” J.A. 169.

. This point bears emphasis. Some police dogs are trained to bite the first person they encounter, making no distinction between suspects and bystanders. See, e.g., Lowry v. City of San Diego, 818 F.3d 840, 849 (9th Cir. 2016) ("Bak was not trained to differentiate between a young child asleep or ... a burglar standing in the kitchen with a butcher knife, and would simply bite the first person she found.” (quotation marks omitted)), reh’g en banc granted, 837 F,3d 1014 (9th Cir. 2016). But Appellee repeatedly testified, and it is undisputed in the record, that, unless he is ordered to do so or responding to an attack, Bikkel will not bite unless he smells the scent of the subject he is tracking. See, e.g., J.A. 270 ("Q: So if he's not smelling that person, he won’t bite the person? A: Correct.”). Given this distinction, we think a reasonable officer would be entitled to draw certain inferences from Bikkel’s actions that could not be drawn from the actions of a less discerning dog.

. The dissent would omit this fact from the reasonable suspicion analysis altogether, on the theory that Appellant’s rationale for not identifying himself—fear that he would be bitten—ultimately proved correct. I fail to see how that matters. The question is whether Appellant’s decision to remain hidden would have appeared suspicious to a reasonable officer.

. Appellant made passing reference in his briefing to the district court and this court to the fact that the officers, including Appellee, handcuffed him for some period of time while they treated his wounds and waited for emergency medical services personnel to respond. Because Appellant failed to develop this argument to any extent in his brief, we consider it waived. See Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 152 n.4 (4th Cir. 2012).

. For this reason I find curious the dissent's critique of our “rule” as it relates to the timing of Appellee’s decision to call off the dog. Post at 47 n. 5. It may be, as Judge Harris suggests, that the use of force became unconstitutional the very second Appellee realized Appellant was not his suspect. Perhaps not. I would simply leave that question for another day, establishing no rule at all—one way or the other. The timing of the events in question is, however, relevant to the question we do *222 answer: whether every reasonable officer in Appellee’s shoes would have known his conduct violated the Fourth Amendment. Some cases (ours and others) have made clear that gratuitously prolonging the use of a police dog is unconstitutional. See, e.g., Kopf, 942 F.2d at 267-69 (no qualified immunity where officer continued to allow dog to bite clearly unarmed suspect that was surrounded by several officers who were beating the suspect into submission); Becker, 821 F.3d at 929 & n.2 (no qualified immunity where officer allowed dog to continue biting after pulling a nonresistant suspect down the stairs and knelt on his back). Critically, though, what those cases do not say is that it is per se gratuitous for an officer to make a split-second decision to use a dog to preserve the status quo when the tense, rapidly-unfolding pursuit of a suspect suddenly escalates into the spontaneous seizure of a concealed bystander.